David KRUPA, Philip J. Kempista, James Leonard, Edward Maxwell and Andrew Miller, on behalf of all other similarly situated persons, Plaintiffs,

v.

NEW CASTLE COUNTY, Defendant.

Civ. A. No. 87–88 LON.

United States District Court,
D. Delaware.

March 15, 1990.

Gary W. Aber, of Heiman, Aber & Goldlust, Wilmington, Del., for plaintiffs.

James J. Sullivan (argued), Alfred J. D'Angelo, Jr., Raymond A. Kresge and Robert H. Barron of Pepper, Hamilton & Scheetz, Wilmington, Del., for defendant.

## OPINION

LONGOBARDI, Chief Judge.

The Plaintiffs, David Krupa, Philip Kempista, James Leonard, Edward Maxwell and Andrew Miller (collectively the "Plaintiffs"), filed a complaint alleging that New Castle County ("County"), through its police department by whom they were employed as patrolmen, had discriminated against them on the basis of their race. Docket Item ("D.I.") 1, 6. The amended complaint asserts that the County violated the equal protection and due process clauses of the Fourteenth Amendment to the Constitution; the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981;[1] the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983[2] and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e-17 (1982) ("Title VII"),[3] when it promoted a black male to the position of sergeant instead of one of the Plaintiffs. The complaint also alleges that the Plaintiffs were denied a protected property interest in a merit based promotional procedure in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution and section 1983.

The County moved for summary judgment. At oral argument, the Court, with the permission of the Defendant, permitted the Plaintiffs to file a cross-motion for summary judgment. The parties have submitted 58 separate stipulations of fact. D.I. 43. The County and the Plaintiffs have also submitted facts as to which agreement could not be reached. *See* D.I. 43, Exhibits ("Ex.") A and B respectively.[4] The issues before the Court on these cross-motions for summary judgment are whether the County has violated the Plaintiffs' constitutional and statutory rights by its utilization of an affirmative action plan which considered race in the promotional process.

## I.  FACTUAL BACKGROUND [5]

The County, a municipality organized under the laws of Delaware, maintains a police department ("Police Department"). Unless otherwise indicated, the Plaintiffs were at all relevant times employed as patrolmen by the Police Department. The position of patrolman (also referred to as "sworn officer" or "police officer") is the entry level position for newly sworn officers. In order to be qualified to become a police officer, an applicant must have com-

---

1.  The Plaintiffs' section 1981 claim is based upon the County's allegedly unlawful denial of promotions to the Plaintiffs based upon their race.  D.I. 1 at ¶ 18.

2.  The Plaintiffs' section 1983 claim is based upon the alleged violations by the County of the Plaintiffs' due process rights and rights to equal protection under the laws as guaranteed by the Fourteenth Amendment to the Constitution. D.I. 1 at ¶¶ 21, 23.

3.  On May 19, 1987, the United States Department of Justice issued to the Plaintiffs a "right to sue" letter.  Accordingly, the Complaint was amended to add a claim under Title VII.  D.I. 6, Exhibit A.

4.  Many of these are not material disputes and the balance could be utilized in any event because they represent unopposed factual matters supported by affidavits.

5.  Unless otherwise indicated, the facts relied upon in this opinion are adopted from the Plaintiffs' and Defendant's Stipulation of Facts.  D.I. 43.

pleted high school or have a G.E.D. equivalency; be 21 years of age; be of good moral character and physical condition; have height and weight in proper proportion; possess a valid Delaware Class A drivers license or its equivalent; and prior to September, 1988, be a resident of the County at the time of the application. After serving for 12 years, a patrolman is automatically promoted to the next highest rank, corporal.[6]

Patrolmen have the opportunity to seek promotion to "command positions." The command positions in hierarchical order are: sergeant, lieutenant, captain, major and chief. The promotional policies of the Police Department are governed by the provisions of 9 Del.C. § 1451 which provides, *inter alia*, that promotions be based "... according to competency and fitness, to be ascertained when possible by competitive examination...." On September 21, 1983, the County and the Fraternal Order of Police, New Castle County Lodge No. 5 (the Plaintiffs' collective bargaining agent) entered into an agreement that set forth, *inter alia*, that a merit system be utilized by the County in compliance with 9 Del.C. § 1451.[7] D.I. 43, ¶ 10.

The Police Department's Affirmative Action Plan provides:

Goal # 2—New Castle County Police will promote minorities and/or females to supervisory positions provided that they qualify in the *same manner* as other candidates for the promotion to supervisory positions and provided there is a

*validated* promotional instrument to be used.

*Timetable*—July, 1981, and ongoing as the opportunity or vacancy becomes available.

*Responsibility*—Chief of Police and Director of Personnel.

D.I. 43, ¶ 11 (emphasis added). Section 1183(a)(1) of Title 9 of the Delaware Code provides, *inter alia*, that "[n]o person shall be ... in any way favored or discriminated against with respect to, any county position ... because of race, or color, or national origin, or political, or religious opinions or affiliations."

Applicants for the sergeant's position are required to have a minimum of 3 years of experience as a sworn officer. Additionally, applicants must undergo a competitive promotional process which includes a validated examination.[8] It is content neutral and designed to test expected job performance in patrolmen seeking promotion. The purpose of the validated testing process is to identify the most qualified applicant for the command position sought. The applicant's total score consists of two parts: 95% of the score was based on 3 equally weighted parts—a written examination, an oral interview conducted by a superior officer and a performance rating based upon the prior year; and 5% of the score is based upon seniority. The test results are tallied and an overall score is obtained. The applicants are then ranked and "banded" at natural scoring breaks based on the overall score. Each scoring band contains applicants who are considered equally capable candidates.[9]

---

**6.** The position of "corporal" is not a "command position" and is based solely on the number of years of service.

**7.** Section 1451 provides that an ordinance shall be adopted by the County that is guided by the principle that "the regulation of ... promotion [be administered] according to competency and fitness, to be ascertained when possible by competitive examination and, when not, by due consideration to qualifications and record of performance." 9 Del.C. § 1451(f)(3).

**8.** The examination was prepared by the firm of Wollack & Associates, an organization which prepares validated or job oriented tests.

**9.** The reason for this is that the reliability of the test does not warrant distinguishing among the

relative abilities of candidates with scores in a particular band. The County Attorney's Office described the validated testing process and the banding process as follows:

The most appropriate use of assessment information takes account of the precision or reliability of the testing instruments. Score ranges or "bands" should be established in accordance with the standard error of measurement, a statistic which describes the precision of the assessment measures. Within a given band, it is appropriate to consider all candidates equally capable, i.e., the reliability of the selection instruments does not warrant distinguishing among the relative ability of candidates whose composite scores fall within a particular band. *Certainly, however, the*

When a sergeant's position becomes available, only those applicants who are in the top or first band are certified by the County for promotional consideration. Individuals in the next lower bands will be certified if a promotion becomes available and there are less than 3 individuals on the certification list. It is stipulated by the parties that even those individuals who are not in the top band, and therefore not certified, are also deemed "qualified" for the sergeant's position. If no member of a protected class (defined to include minorities, the handicapped and women) is on the certified list (put another way, if no member of these groups scored in the top band), then the 3 highest ranking members of the protected class from a lower band are added to the certification list. Once gathered, the list of certified candidates is submitted to the County Director of Public Safety and the Police Department Chief for a final determination regarding promotion. In this particular situation, the Chief had the discretion to choose any one of those individuals on the certified list.

The Plaintiffs took part in the 1984 testing procedure for the position of sergeant. At that time there were 6 minorities who were eligible to take the examination. Eighty-five individuals passed the examination. When the scores were broken into rank order and banded, there were 10 individuals in band 1 (including each of the 5 Plaintiffs), 34 individuals in band 2, 24 individuals in band 3 (including Officer Bryant, the minority person who received the sergeant's position at issue), 14 individuals in band 4, and 3 individuals in band 5. Since there were no members of the protected class in band 1, protected class members from lower bands were added to the certification list.[10] Three sergeants' positions were filled from this certification list. Two positions went to white males who had

originally scored in band 1. The third position went to Officer Bryant, a black male, who had scored in band 3 and was actually somewhere between 45th and 69th on the list.[11] Chief McCarnan, the County Police Chief, testified that he selected Officer Bryant primarily because of his experience in the areas of independent undercover investigations, his educational background and training and his overall superior qualifications. D.I. 18, Ex. B, ¶ 12. At his deposition, Chief McCarnan testified that in making his selection he treated those members of the protected class who were moved up into the certified list as if they were from band 1. He also ignored the fact that the validated testing process demonstrated that those who scored in band 1 were more qualified than those placed in lower bands. *See supra*, n. 9.

## A. Alleged Evidence of Historical Underrepresentation of Minorities in the County Police Force

The County Police Department hired its first minority into a sworn officer position in 1969. D.I. 18, Ex. B, ¶ 15. Prior to 1976, only one minority was eligible for and took the sergeant's examination. As of September, 1984, the County Police Department consisted of 198 sworn officers. Of that number, 16 (approximately 8%) were minorities. Sworn officers in command positions of sergeant or above accounted for 47 officers, 30 of these positions were of the rank of sergeant. None of the positions above sergeant were held by minorities, while 2 (6.6%) of the 30 sergeants positions were held by minorities.

General population statistics from the United States Department of Commerce, Bureau of the Census, reported in the 1980 census that 16.94% of the residents of the County were non-white minorities. U.S.

*candidates in the higher bands are as a group more qualified than the candidates in the lower bands.*

D.I. 43, ¶ 19 (emphasis added).

**10.** Two minority individuals were moved up to the certified list from band 2, and 3 (including Officer Bryant) were moved up from band 3. It was necessary to move 3 individuals from band 3 to the certified list because those in a particu-

lar band are deemed equally qualified. D.I. 18, Ex. C, ¶ 8.

**11.** No other promotions were made from this promotion list. It is obvious that the originally certified persons in band 1 provided a sufficient pool to satisfy the limited needs of this relatively small police force.

Bureau of the Census, *County and City Data Book* (1983) at 74.[12] D.I. 18 at 8 n. 8. The Delaware Department of Labor, Office of Occupational and Labor Market Information, reported in its 1985 census update that 15.2% of the civilian labor force consisted of minorities. Office of Occupational and Labor Market Information, Del. Dep't of Labor, *Report C: Labor Market Information For Affirmative Action Compliance Planning, Delaware 1985 Update* at 11 (1986).[13] D.I. 18 at 8 n. 9.

### B. *Discrimination Complaints and Suits Against the County by Minority Police Officers*

Several charges of racially motivated employment discrimination had been brought against the County and its Police Department in the late 1970's. Beginning in October 1977, Robert C. Snow, a black police officer, filed employment discrimination charges against the County with various federal agencies. The first charges were brought to the Equal Employment Opportunity Commission ("EEOC").[14] The complaint alleged that the County discriminated against Officer Snow on the grounds of race by refusing to promote him to the position of police sergeant. This allegation was denied by the County. Officer Snow had taken a sergeant's examination that had not been statistically validated. D.I. 18, Ex. H at 2. The EEOC found that the County had not met its burden of proving that the "exclusionary testing device" was job related. *Id.* The EEOC further found that 11.2% of the total County work force

was black and that the County had 179 police officers, of which only 7 (3.9%) of the patrolmen were black and none of the positions above the rank of patrolman were held by black officers. The EEOC Report went on to state that:

> The percentage of blacks in the community is substantially greater than that represented in [the County's] workforce. Furthermore, the distribution of blacks within [the County's] workforce shows concentrations sharply different from what would be true if there was no bias present. There is no evidence that the [County] has engaged in recruitment that would change this disparity. In absence of any legitimate explanation for these afforementioned [ (sic) ] circumstances, it is reasonable to infer that [the County] hires on the basis of race and that its promotional practices reflect the same bias.

*Id.*[15] The EEOC concluded its report by extending an invitation to the parties to reach a settlement in the matter. A Conciliation Agreement was then proposed by the EEOC. The parties did not agree to this Conciliation Agreement.[16] Officer Snow eventually brought a federal law suit against the County and the County Police Department on the same claims of racial discrimination. That federal lawsuit and the EEOC complaint were eventually settled through a confidential settlement agreement between the charging parties and the County.

Carlton Moss, along with other black police officers, also filed a charge of racial

---

**12.** This figure was arrived at by subtracting the percentage of County residents listed under the race category of "white" (83.06%) from 100%.

**13.** This figure was arrived at by subtracting the percentage of individuals in the County work force who were listed under "white not Hispanic" (84.8%) from 100%.

**14.** Two other minority police officers joined Officer Snow in these charges.

**15.** The County "developed" its affirmative action plan for hiring in the Police Department, including 50% hiring goals, on or about September, 1980. D.I. 49. The County affirmative action plan "became effective" in June of 1981. D.I. 34A at 65. The hiring goals were producing results. For example, the statistics indicate that

in 1980, there were 194 sworn officers in the Police Department. Twelve of these were minorities. In September of 1984, less than 3½ years after the hiring plan became effective, there were 198 sworn officers in the Police Force, 16 of whom were minorities.

**16.** The EEOC Conciliation Agreement would have required the Police Department to promote the charging party to sergeant; develop a validated test for promotions; develop and administer an affirmative action plan; *and hire and promote black and minority employees so that their participation in all job classifications would approximate their percentage in the County.* D.I. 18, Ex. I.

discrimination with the United States Department of Justice, Law Enforcement Assistance Administration ("LEAA"), against the Police Department. The complaint alleged, *inter alia*, that the Police Department discriminated against minorities in promotions on the basis of race. The Office of Civil Rights Compliance, Office of Justice Assistance, Research and Statistics, investigated the charges and issued Investigative Findings. D.I. 18, Ex. J. In January, 1980, after reviewing the results of that investigation, the LEAA concluded that it could not "... conclusively determine that race was a factor in the complainants not being promoted." *Id.* at 3.

In 1979, a charge was filed with the Secretary of Treasury, Office of Revenue Sharing ("ORS"), alleging that the Police Department engaged in racial discrimination in, among other things, hiring, recruitment, training and promotion. In particular, Officers Robert Snow, Carlton Moss and Charles Harris alleged that they were denied promotions on the basis of their race. D.I. 18, Ex. A. In the findings attached to the ORS Report, the ORS found that of the 196 sworn personnel on the County Police Force, 12 (6.1%) were minority persons and 7 (3.1%) were females. *Id.* at ¶ I–A. Since the U.S. Census figures indicated that the "County's relevant labor force [was] comprised of 12.9% minority persons and 37.1% females", the ORS concluded that minorities and females were statistically underrepresented in sworn positions. *Id.* The ORS concluded that recent minority *hiring* by the Police Department "... while not completely remedying the disparity between minority persons employed in sworn positions and their availability in the labor market, *demonstrates sufficient action taken by the County* in an effort to reach a level of minority employment which approximates minority representation in the relevant labor market." *Id.* (emphasis added).[17] The ORS Report continued, stating "that a review of the total selection process previously utilized *did not show an adverse impact on minority candidates.*" *Id.*, ¶ I–C2 (emphasis added).[18]

With regard to promotional practices, the ORS Report concluded that because the number of minority applicants seeking promotions was statistically small, the ORS was "unable to draw any valid conclusions concerning the promotional procedures employed." *Id.*, ¶ II–A. The ORS also found that the most recent minority promotions had been at a rate of 50%, in that 2 of the last 4 officers receiving promotions were minorities.[19] As a "remedy" the ORS Re-

---

17. Statistically, the ORS found that recent appointments by the Police Department indicated that 14 persons were selected for sworn officer positions and that 4 (28.6%) of these were minorities and 1 (7.1%) was female. The ORS Report "acknowledge[d] that an extensive recruitment program was conducted by [the] ... County prior to the last examination for Police Officer positions. The continuation of such recruitment efforts, as part of the Affirmative Action Plan, *would show a good faith effort by the County* to recruit minority persons and females." *See* D.I. 18, Ex. A, ¶ I–B1. This Report, which was dated July, 1980, recognizes that the County had begun a minority recruitment initiative as early as 1980.

18. With respect to training opportunities, the ORS Report concluded that "there appears to be no pattern of discrimination when considering the number of courses or seminars attended by the officers." D.I. 18, Ex. A, ¶ IV–A. The Report also stated that with respect to "specialized or out-of-state training courses ... the records show that in all instances except one majority personnel were selected to attend such courses."

*Id.* This finding was not accompanied by a finding of discrimination based on race. The most that could be said in that regard was that such decisions were "haphazardly or with partiality" made. *Id.*

With respect to pre-employment inquiries made by the County Police Department, the ORS Report made no finding of prior discrimination by the Police Department. The ORS merely stated that "the application forms and background investigation form utilized contain pre-employment inquiries which *could* have an adverse impact on the basis of sex, race or national origin and/or handicap status." *Id.*, ¶ V–A.

19. The ORS Report stated that only 1 minority was eligible to take the sergeant's examination prior to 1976. D.I. 18, Ex. A, ¶ II–A. That person did, in fact, take the examination. *Id.* In the last round of testing for the sergeant's position that was considered in the Report, 3 of the 79 applicants for the test were minorities. *Id.* The Report stated that "the minority applicants allegedly were not certified for promotion due to their respective rankings on the resulting

port requested that the County submit to the ORS a validation study for the new sergeant's promotional examination together with documentation detailing the selection procedure to be used by the County in making subsequent promotions to the rank of sergeant. *Id.,* ¶ II–B. The ORS requested that this data be submitted to them prior to its actual use. *Id.*[20] The County responded to the ORS requests by stating that "[w]ell before the Treasury [ORS] review of County practices began, New Castle County had begun the process of constructing a valid promotional procedure. A copy of the validation study will be provided once it is received by New Castle County later this fall." D.I. 18, Ex. K, ¶ 4.[21] The County and the ORS entered into a Compliance Agreement with the County agreeing to submit a description of the new validated promotion procedure by December 31, 1981. D.I. 18, Ex. L, ¶ 2–d.[22] The County, in entering this Compliance Agreement, expressly did not admit any violation of the State and Local Fiscal Assistance Act of 1972.[23]

### C. *New Castle County Code*

In 1984, the County amended County Code section 12–99 to allow for the certifi-

cation of 3 members of "protected class(es)" in the event no members of the protected class were on the original certified list (referred to as the "County Plan" or the "Plan"). County Ordinance No. 84–042, amending the County Code relating to Affirmative Action Certification, provided:

WHEREAS, New Castle County must abide by the principles of affirmative action and equal employment as defined in New Castle County Code, Section 12–23 and Title VII of the Civil Rights Act of 1964,

WHEREAS, New Castle County desires to implement a certification procedure whereby members of protected classes are given equal opportunity to be selected for all positions within the County,

THE COUNTY OF NEW CASTLE HEREBY ORDAINS:

Section 1. Section 12–99, New Castle County Code, is hereby amended by adding the material underlined and by deleting the material in brackets as follows:

When a personnel requisition is received, the Personnel Director shall certify the top three (3) names from an eligible list as provided in Section 12–98 above. *In addition,* [If] *if* no one of the

---

eligibility lists." *Id.* The Report offers no other explanation for the failure of these minorities to receive promotions.

**20.** The ORS also requested that the County revise its affirmative action plan to include hiring goals and timetables for females and minorities in sworn positions, D.I. 18, Ex. A, ¶ I–B1; provide the ORS with various reports describing the Police Department's progress towards the affirmative action plan's objectives, *Id.,* ¶ I–B2; and eliminate certain listed pre-employment inquiries that *could* have a discriminatory impact. *Id.,* ¶ I–B. The County developed its hiring initiative with 50% hiring goals in September of 1980. This plan became effective in June of 1981. This plan was revised throughout the period of 1980–1984. In 1984, in a continuing effort to improve the plan, the County "recruitment program [was] ... aimed at targeting the County's recruitment efforts into certain areas of the County that had relatively high minority population." D.I. 48. There is no evidence of the results of this latest initiative in the record.

**21.** This letter also explained the County's response to the other requests made by ORS.

**22.** The Compliance Agreement also addressed the other requests made by the ORS in the ORS Report. In a letter from the Department of Treasury (ORS) to the County Executive addressing the County's annual compliance report, the ORS noted that "[t]he hiring of minority officers exceeded the labor force availability as well as the percentage of minorities on the eligibility list. It is noted however that there were only 9% minorities on the list compared to the 15% minority labor force availability." D.I. 18, Ex. D at 1. The Report also indicated that as of October, 1984, the County had not yet completed the establishment of its "recruitment program to increase the number of minority and female applicants for police officer." *Id.; see also supra,* n. 20.

**23.** The Compliance Agreement also contemplated that if the County did not comply with the terms of the agreement, the Director of the ORS would "issue a determination under Section 122(b)(2) of the Revenue Sharing Act that the County of New Castle, Delaware has not complied with the provisions of the State and Local Fiscal Assistance Act of 1972, as amended." D.I. 18, Ex. L, ¶ 4.

three (3) people certified for a position [that may be filled by noncounty employees] as provided in this chapter, is a [women or a member of a minority group] *member of a protected class (a women, handicapped, or a member of a minoritr group)* encompassed by the County Affirmative Action Program, the Personnel Director shall certify the names of the three highest ranked [women and/or members of minority groups] *members of a protected class* on the list.

Section 2. This Ordinance shall take effect immediately upon its adoption.[24]

### D. *Plaintiffs' Proposed Facts Not Stipulated to by the Parties*

The following assertions of fact are submitted by the Plaintiffs as representative of those "facts" to which the parties could not reach an agreement. The first group of such "facts" involve the issue of prior discrimination by the County in its employment practices. The Plaintiffs cite to various portions of the record, all indicating that the County has not engaged in discrimination based on race and that the County has a long-standing policy of nondiscrimination. D.I. 43, Ex. A, ¶¶ 1–5.[25] Furthermore, the Plaintiffs state as an unagreed to "fact" that there were no discriminatory practices by the County that did or could have impacted upon the Police Department.[26] *Id.,* ¶ 5. The Plaintiffs have also offered the affidavit of the former attorney for the Fraternal Order of Police Chapter ("FOP") representing the County Police Department. D.I. 34 at 50–51. The affidavit states that a meeting was held between the attorney, Richard R. Weir, Jr., and Mathias Fallis, the outgoing Director of Personnel for the County, Sandra Kaufmann, Esquire, the incoming County Personnel Director, and Robert Lynch, who was then the President of the FOP for the County Police Department. *Id.* at 50. Mr. Weir states in his affidavit that "Mr. Fallis stated that Patrolman Bryant was promoted on the basis of his race. Mr. Fallis went on to explain that the Chief, John McCarnan, had received a directive to select a minority because the first two appointments previously made to Sergeant off the then existing eligibility list had not been minority appointments." *Id.* at 51. Weir also testified that he had a "specific present recollection of that meeting." *Id.*

The other "facts" asserted to be in dispute involve the validated promotional examination process. The Plaintiffs have presented an affidavit stating that validated (job-related) tests that utilize scoring bands, such as the one used in this case, will indicate those applicants who are more likely to perform better on the job. D.I. 34A at 30. The "job performances of a candidate in Band III is likely to be less than the job performance of those individuals in Bands I and II [and] those individuals in Bands I and II are to be deemed better qualified for promotion than individuals in Band II or below." D.I. 43, Ex. A, ¶ 8.

**24.** *See* D.I. 18, Ex. M. Ordinance 84–042 was adopted on April 24, 1984. This was less than 3 years after the County's affirmative action program with 50% hiring goals became effective. D.I. 34A at 65. Additionally, it was less than 3½ years after the validated testing process was developed by Wollack & Associates. D.I. 34A at 38. However, the County began to target high minority population density areas in the County as late as 1984. D.I. 48.

**25.** The Plaintiffs offer the deposition testimony of Chief McCarnan to the effect that he knows of no discriminatory acts against minorities or employment decisions based on race taken by the County since 1968 and he knows of no employment practices with a disparate racial impact on minorities. *See* D.I. 34A at 138–39. Also, the Plaintiffs offer the County's responses to requests for admissions. *Id.* at 99 (during the period of 1980 to 1985, County did not engage in any intentional racial discrimination in promotions); *id.* at 106 (despite County's long-standing policy of nondiscrimination, there is a conspicuous racial imbalance in sergeant's position).

**26.** The deposition of Mathias J. Fallis, the outgoing Director of Personnel for the County, was to the effect that he knew of no discrimination prior to his administration other than the discrimination charges filed by Officers Moss, Harris and Snow. D.I. 34A at 117–18. Sandra Kaufmann testified at her deposition that during her tenure as Personnel Director she was not aware of any discriminatory practices engaged in by the County Police Department. *Id.* at 160.

E. *Defendant's Proposed Facts not Stipulated to by the Parties*

The Defendant contends that race was not one of the factors that Chief McCarnan relied on to decide on Officer Bryant's promotion. D.I. 43, Ex. B, ¶¶ 1, 13. Also in dispute among the parties is whether any of the other applicants on the certified list had Officer Bryant's undercover experience or educational experience. *Id.*, ¶ 14. The County also asserts as a "fact" that no quotas were used by the County in promoting minorities to supervisory positions and the County Plan did not require that minorities be promoted nor did it require that race be considered in making a final determination concerning an individual promotion. *Id.*, ¶ 12.

The Defendant also makes assertions of fact relating to the statistical analysis to be used in assessing the Plan's legitimacy. They assert that the 13.1% estimate of availability of minorities in the relevant labor market is a "conservative" estimate "in that it includes a disproportionate group of whites who are qualified to become policemen, but who have reached a level of income and/or occupational success which precludes their interest in being a police officer." *Id.*, ¶ 22.[27] The Defendant continues by stating that if all those who hold managerial or professional jobs paying over $30,000.00 annually are removed from the group, then the minority pool increases to 14.3%. *Id.*, ¶ 23. Additionally, the Defendant asserts that "[a]bsent historical discrimination, minority representation on the police force and in the various command positions should be statistically equivalent to the minority representation among the qualified population in the relevant labor force." *Id.*, ¶ 26. The conclusion of the Defendant's statistician that the minority representation in the County Police Department is not "statistically equivalent", *id.*, ¶ 27, to that of minorities in the relevant labor force is based on a difference of 2.09 standard deviations. *Id.*, ¶ 28. The statistician concludes that "in 1984, minorities were statistically significantly underrepresented among the sworn officers' ranks." *Id.* He also concludes there was a similar underrepresentation in sergeant's positions and command positions. *Id.*, ¶ 29.

## II. DISCUSSION

A. *Summary Judgment Standards*

The parties have both moved for summary judgment. Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law governing the issues defines those facts which are material and it is only genuine disputes over these facts which will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Once a properly supported motion is presented, the party opposing the motion is required to come forward with sufficient evidence of a factual conflict that could be resolved by a trier of fact. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In this regard, unopposed affidavits containing "facts" which could not be agreed upon might, after all, be used as a basis for summary judgment.

The filing of cross-motions for summary judgment does not require the Court to grant summary judgment for either party. *Mingus Constructors, Inc. v. U.S.*, 812 F.2d 1387, 1391 (Fed.Cir.1987).

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed

27. Why the same assumption is not true as to minorities escapes the Court.

of by a plenary trial and not on summary judgment.

*Rains v. Cascade Industries, Inc.*, 402 F.2d 241, 245 (3rd Cir.1968). This is based on the rationale that each party may be grounding its motion on a different legal theory with divergent material facts. *Schlytter v. Baker*, 580 F.2d 848, 849 (5th Cir.1978). The basis for the rule disappears, however, where both parties "proceed on the same legal theory and on the same material facts...." *Id.; see generally* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2720 (2d ed. 1983) ("Wright & Miller"). The Court must view each of the parties' motion for summary judgment by considering the facts and all reasonable inferences most favorably to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 900 (3rd Cir.), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987); *Hersh v. Allen Products Co. Inc.*, 789 F.2d 230, 232 (3rd Cir.1986).

## B. *Equal Protection*

The equal protection clause of the fourteenth amendment provides that "[n]o State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Judicial review of racially preferential state employment actions under this clause requires an equal application of its provisions regardless of whether the allegedly aggrieved individual is a member of a minority or majority class. *See City of Richmond v. J.A. Croson*, 488 U.S. 469, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989); *University of California Regents v. Bakke*, 438 U.S. 265, 289–90, 98 S.Ct. 2733, 2747–48, 57 L.Ed.2d 750 (1978); *cf. Plessy v. Ferguson*, 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J., dissenting) ("[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens").

### 1. *Strict Scrutiny*

■ The standard that the Supreme Court would apply to a race based affirmative action plan under equal protection clause analysis is finally settled.[28] Strict scrutiny will now be applied by a majority of the Court, including Chief Justice Rehnquist,[29] Justice O'Connor,[30] Justice Scalia,[31] Justice Kennedy[32] and Justice White.[33] As

**28.** As Justice Marshall has indicated, the *City of Richmond* decision "for the first time, [shows that] a majority of this Court has adopted strict scrutiny as its standard of Equal Protection Clause review of race-conscious remedial measures." *City of Richmond,* 109 S.Ct. at 752 (Marshall, J., dissenting).

**29.** Then Justice, now Chief Justice Rehnquist, joined with Justice Powell's opinion in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), that strict scrutiny (compelling state interest and narrow tailoring) is to be applied to classifications based on race under the Equal Protection Clause, regardless of whether the classification "operates against whites and in favor of certain minorities." *See Wygant,* 476 U.S. at 273–74, 106 S.Ct. at 1846–47.

**30.** *See Wygant,* 476 U.S. 267, 284–86, 106 S.Ct. 1842, 1852–53 (O'Connor, J., concurring) (discussed *infra*).

**31.** After stating that "strict scrutiny must be applied to all governmental classification by race", *City of Richmond,* 109 S.Ct. at 735, Justice Scalia said:

> At least where state or local action is at issue, only a social emergency rising to the level of imminent danger to life and limb—for example, a prison race riot, requiring temporary segregation of inmates, ...—can justify an exception to the principle embodied in the Fourteenth Amendment that "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson,* 163 U.S. 537, 559 [16 S.Ct. 1138, 1146, 41 L.Ed. 256], (1896)....

*City of Richmond,* 109 S.Ct. at 735 (Scalia, J., concurring); *see* C. Fried, *Affirmative Action After City of Richmond v. J.A. Croson Co.: A Response to the Scholars' Statement,* 99 Yale L.J. 155, 156 n. 3 (1989) ("C. Fried, *Response to Scholars' Statement*").

**32.** Justice Kennedy stated, in his concurring opinion, that:

> The moral imperative of race neutrality is the driving force of the Equal Protection Clause. Justice Scalia's opinion underscores that proposition, quite properly in my view....
> I accept the less absolute rule [as compared to the rule proposed by Justice Scalia] contained in Justice O'Connor's opinion, a rule based on

**33.** See note 33 on page 507.

the decisions in *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) and *City of Richmond* will show, that standard requires a compelling governmental interest to justify any racial classification and a showing that the means selected to effectuate that objective are narrowly tailored to meet that goal.

■ The determination that strict judicial scrutiny is the appropriate standard· of review only serves as a first step. The more difficult determination is the appropriate application of that standard.[34] For public employers, the Supreme Court has indicated that the "statutory prohibition [ (i.e., Title VII) ] with which [a public] employer must contend was not intended to extend as far as that of the Constitution." *Johnson v. Transportation Agency*, 480 U.S. 616, 627–28, 107 S.Ct. 1442, 1449–50, 94 L.Ed.2d 615 (1987). Put another way, an affirmative action plan adopted by a public employer may satisfy the burdens imposed by Title VII and yet not pass constitutional muster.

Under Title VII a manifest imbalance in a traditionally segregated job category will justify the adoption of an affirmative action plan. *Johnson*, 480 U.S. at 630, 107 S.Ct. at 1451; *see also United Steelworkers of America v. Weber*, 443 U.S. 193, 209–12, 99 S.Ct. 2721, 2730–32, 61 L.Ed.2d 480 (1979). The Supreme Court has indicated that under the manifest imbalance standard, an employer is not required to show the nonstatistical evidence of past discrimination that it would be required to show under the *prima facie* standard. *Johnson*, 480 U.S. at 633 n. 11, 107 S.Ct. at 1453 n. 11. On the other hand, to justify such a plan under the constitutional standard, the State must have a compelling interest for its adoption. While it is not entirely clear how the manifest imbalance standard differs from the compelling interest standard,[35] it appears that the constitution requires some showing of prior discrimination by the public employer to justify the remedial use of race-preferential measures. *See Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847 (equal protection clause requires "some showing of prior discrimination by the governmental unit involved")

the proposition that any racial preference must face the most rigorous scrutiny by the courts.... [T]he strict scrutiny standard will operate in a manner generally consistent with the imperative of race neutrality, because it forbids the use even of narrowly drawn racial classifications except as a last resort.... [T]he strict scrutiny rule is consistent with our precedents, as Justice O'Connor's opinion demonstrates.

*City of Richmond*, 109 S.Ct. at 734–35.

**33.** The determination that Justice White would apply strict scrutiny is not as straight forward as with the other Justices. However, he did join in part III–A of the *City of Richmond* opinion. Part III–A states that it "continue[s] to adhere[ ] to the standard of review employed in *Wygant*...." *City of Richmond*, 109 S.Ct. at 721. In *Wygant*, the plurality opinion employed the classic two-part strict scrutiny test requiring a compelling state interest and narrow tailoring. Furthermore, Part III–A states:

Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of *strict scrutiny* is to "smoke out" illegitimate uses of race by assuring that the legislative body is

pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this *compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.* *City of Richmond*, 109 S.Ct. at 721 (emphasis added). What makes the characterization of Justice White's position difficult is that he did not join in the *Wygant* plurality opinion authored by Justice Powell but rather he concurred in the judgment by separate opinion. That concurrence sheds little light on his position.

**34.** *See* Rosenfeld, *Decoding Richmond: Affirmative Action and the Elusive Meaning of Constitutional Equality*, 87 Mich.L.Rev. 1729, 1748–1756 (1989) ["Rosenfeld, *Decoding Richmond*"] (discussing the various applications of strict scrutiny of the various Justices in the *City of Richmond* majority).

**35.** Judge Silberman has interpreted " '[m]anifest imbalance,' as used by the Supreme Court, [as] a synonym for segregation—whether intentionally maintained or not." *Hammon v. Barry*, 826 F.2d 73, 86 (D.C.Cir.) (Silberman, J., concurring), *reh'g granted in part, en banc*, 833 F.2d 367 (1987), *cert. denied*, 486 U.S. 1036, 108 S.Ct. 2023, 100 L.Ed.2d 610 (1988).

(Powell, J., joined by Burger, C.J., and Rehnquist and O'Connor, JJ.); *City of Richmond*, 109 S.Ct. at 720 (agreeing with *Wygant* plurality and adding that if public employer has become even a "passive participant" in private discrimination this could support affirmative action) (O'Connor, J., joined by Rehnquist, C.J. and White, J.); *id.* 109 S.Ct. at 727 (evidence did not point to "any identified discrimination in Richmond construction industry") (majority opinion); *id.* at 737 (compelling interest only where public employer has engaged in system of racial discrimination) (Scalia, J. concurring); *id.* at 734–35 ("evidence which would support a judicial finding of intentional discrimination may suffice also to justify remedial legislation") (Kennedy, J., concurring); *see also* C. Fried, *Response to Scholars' Statement*, *supra* n. 31, at 157; Note, *Finding a "Manifest Imbalance": The Case for a Unified Statistical Test for Voluntary Affirmative Action Under Title VII*, 87 Mich.L.Rev.1986, 1992 (1989); *cf. Sheet Metal Workers v. EEOC*, 478 U.S. 421, 500, 106 S.Ct. 3019, 3062, 92 L.Ed.2d 344 (1986) (Rehnquist, J., dissenting) (in Title VII case, then Justice Rehnquist would limit judicial remedies ordering racial preferences only to those "who have been the actual victims of a particular employer's racial discrimination").

While Title VII requires that the plan must not unnecessarily trammel the rights of those not favored by the plan, *Johnson*, 480 U.S. at 637–38, 107 S.Ct. at 1455–56, under the constitutional standard, the plan must be narrowly tailored to serve the compelling interest. It has been said that the selected means to further a compelling interest is narrowly tailored when there are no other available means that are less intrusive on the rights of those adversely affected by the governmental action. *See, e.g., Wygant*, 476 U.S. at 280 n. 6, 106 S.Ct. at 1850 n. 6 (discussing "secondary mean-

ing" of "narrowly tailored" to mean that the "classification at issue must 'fit' with greater precision than any alternative means"); *see also City of Richmond*, 109 S.Ct. at 734 ("strict scrutiny standard ... operate[s] ... [to] forbid[ ] the use of even narrowly drawn racial classifications except as a last resort") (Kennedy, J., concurring). It follows that if the remedy adopted to comply with the statutory standard is less exacting than the constitutional standard, a racially preferential plan may achieve the "fit" demanded by the statutory standard but at the same time not be "snug" enough for the constitutional demands. *Johnson*, 480 U.S. at 627–28, 107 S.Ct. at 1449–50.

While it produced no majority opinion, Justice O'Connor's "narrow grounds" [36] concurrence in *Wygant* is instructive on the evidence necessary for a government employer to justify an affirmative action plan.

> I subscribe to Justice Powell's formulation [of strict scrutiny] because it mirrors the standard we have consistently applied in examining racial classifications in other contexts.... [*Wygant*, 476 U.S. at 285, 106 S.Ct. at 1852.]

> [That standard contains two prongs. "First, any racial classification 'must be justified by a compelling governmental interest'.... Second, the means chosen by the State to effectuate its purpose must be 'narrowly tailored to the achievement of that goal.'" *Wygant*, 476 U.S. at 274 [106 S.Ct. at 1847] (Powell, J. joined by Burger, C.J. and Rehnquist and O'Connor, JJ.) ].... The Court is in agreement that, whatever the formulation employed, remedying past or present racial discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action

**36.** There was no opinion in which 5 members of the Court joined. Justice O'Connor's concurrence was on "narrow grounds" and, when read in conjunction with those portions of Justice Powell's opinion in which she concurred, one may take Justice O'Connor's concurrence as the opinion of the Court. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51

L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....'").

program.... [*Id.* at 285–86, 106 S.Ct. at 1852–53.] I agree with the plurality that a government agency's interest in remedying *"societal"* discrimination, that is, discrimination *not traceable to its own actions, cannot* be deemed sufficiently compelling to pass constitutional muster under strict scrutiny.... [*Id.* at 288–89, 106 S.Ct. at 1854–55.] I [also] ... agree with the plurality that a *contemporaneous or antecedent finding of past discrimination by a court or other competent body is not a constitutional prerequisite* to a public employer's voluntary agreement to an affirmative action plan.... [*Id.* at 289, 106 S.Ct. at 1855.] In "reverse discrimination" suits, as in any other suit, it is the plaintiffs who must bear the burden of demonstrating that their rights have been violated.... [W]hen the Board introduces its *statistical proof* as evidence of its remedial purpose, thereby supplying the court with the means for determining that the Board had a *firm basis* for concluding that remedial action was appropriate, it is incumbent upon the nonminority teachers to prove their case; they continue to bear the ultimate burden of persuading the court that the Board's evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently "narrowly tailored."

*Id.* at 292–93, 106 S.Ct. at 1856–57 (O'Connor, J., concurring) (emphasis added).[37] The *Wygant* plurality did state that "[i]n particular, a public employer ... must en-sure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination." *Id.* at 277, 106 S.Ct. at 1848 (Powell, J., joined by Burger, C.J., Rehnquist and O'Connor, JJ.). Furthermore, "[e]videntiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is challenged in court by nonminority employees." *Id.* The trial court's duty in such cases is to "make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary." *Id.* With respect to the statistical comparison necessary to supply a compelling reason to justify the adoption of an affirmative action plan, *Wygant* indicates that the appropriate comparison is between the percentage of workers in the employer's work force and the percentage of minorities in the area labor pool who possess the relevant qualifications needed for that job.[38] *See also Janowiak v. Corporate City of South Bend,* 836 F.2d 1034, 1041 (7th Cir.1987) (reversing District Court grant of summary judgment based on an insufficient general population statistical comparison), *cert. denied,* —— U.S. ——, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989); *J. Edinger & Son, Inc. v. City of Louisville, Ky.,* 802 F.2d 213, 216 (6th Cir. 1986) (requiring more than a general population statistical comparison); *Cygnar v. City of Chicago,* 865 F.2d 827, 839–40 n. 12 (7th Cir.1989).[39] By gearing the statistical

---

**37.** The Supreme Court in *Johnson,* 480 U.S. at 620, n. 2, 107 S.Ct. at 1446, n. 2, indicated that "where the issue is properly raised, *public employers must justify the adoption and implementation* of a voluntary affirmative action plan under the Equal Protection Clause. *See Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986)." As the Court said in *Wygant,*

No one doubts that there has been serious racial discrimination in this country. But as the basis for imposing discriminatory *legal* remedies that work against innocent people, *societal* discrimination is insufficient and overly expansive. In the absence of *particularized findings,* a court could uphold remedies that are ageless in their reach into the past,

and timeless in their ability to affect the future.

*Wygant,* 476 U.S. at 276, 106 S.Ct. at 1848 (plurality opinion).

**38.** The Seventh Circuit has indicated that this is the "lowest common denominator" holding of *Wygant. Janowiak v. Corporate City of South Bend,* 836 F.2d 1034, 1041 (7th Cir.1987); *see also id.* at 1042 n. 9 (discussing other circuit courts that have reached a similar result).

**39.** The Title VII jurisprudence has developed similar language with respect to the statistical showing needed to justify an affirmative action plan under the statutory standard. *See, e.g., Wards Cove Packing Co. v. Atonio,* —— U.S. ——, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (qualified

analysis towards the "qualified" labor pool, the Court is recognizing the common sense reality that a public employer such as the County cannot be expected to promote minorities to sergeant if none are available who possess the required special skills and qualifications. *See* Daly *Some Runs, Some Hits, Some Errors—Keeping Score in the Affirmative Action Ballpark from Weber to Johnson,* 30 B.C.L.Rev. 1, 35 (1988).

In *City of Richmond,* 109 S.Ct. 706, the Supreme Court addressed a race conscious government preference program. At issue was the minority set-aside program developed by the City of Richmond whereby prime contractors awarded city construction jobs were required to subcontract at least 30% of the dollar amount of the job to businesses, 51% of which were minority owned (defined to include Blacks, Spanish-speaking, Oriental, Eskimo, Indian and Aleut people who were citizens of the United States). Richmond had a general population that was 50% Black. Of the prime construction contracts awarded by the city in the 5 years between 1978 to 1983, only .67% of them went to minority businesses.[40] There was no direct evidence of any race discrimination on the part of the city in letting contracts or any evidence that the city's prime contractors had discriminated against minority-owned subcontractors.

Several conclusions can be gleaned from the case. Initially, "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *City of Richmond,* 109 S.Ct. at 723. The reason for this is that "[i]t has no logical stopping point." *Id.* "[R]elief for such an ill-defined wrong could extend until the percentage of public contracts awarded to [minorities] mirrored the percentage of minorities in the population as a whole." *Id.*

Furthermore, "an amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial *quota.*" *City of Richmond,* 109 S.Ct. at 724. Just as in *City of Richmond* in which the Court said it is "sheer speculation how many minority firms there would be in Richmond absent past societal discrimination", *id.,* it would be sheer speculation to conclude how many minorities would be members of the County Police Department (as sworn officers or in command positions) absent past societal discrimination.[41]

In justifying an affirmative action plan "the mere recitation [by a local legislature] of a 'benign' or legitimate purpose for a racial classification, is entitled to little or no weight." *City of Richmond,* 109 S.Ct. at 724. "Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice." *Id.* "A governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists." *Id.* at 725. Rather, it appears that the Court will require "a *strong*

---

relevant labor pool statistical comparison); *Johnson v. Transportation Agency,* 480 U.S. at 632, 107 S.Ct. at 1452; *Hazelwood School District v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977).

**40.** The fact that the statistical analysis engaged in by the City of Richmond was with respect to *prime,* as opposed to *sub-contractors, was one of the determinative factors in the case.*

**41.** Several commentators have expressed similar thoughts. *See, e.g.,* Abram, *Affirmative Action: Fair Shakers and Social Engineers,* 99 Harv.L.Rev. 1312, 1315 (1986); Loury, *Why Should We Care About Group Inequality?,* 5 Soc.Phi & Poly. 249, 250 (1987); T. Sowell, *Civil Rights: Rhetoric or Reality?* 37–60 (1984). *See* also *Sheet Metal Workers,* 478 U.S. at 494, 106 S.Ct. at 3059 (O'Connor, J. concurring in part and dissenting in part); *Hammon v. Barry,* 826 F.2d at 87 (Silberman, J., concurring).

In his book, *Civil Rights: Rhetoric or Reality?,* Thomas Sowell gives numerous examples of ethnic groups which have traditionally been "overrepresented" in various diverse jobs. For example, Chinese are disproportionately overrepresented as engineering and natural sciences teachers, *Civil Rights* at 28; Germans as farmers, piano craftsmen and technologists, *id.* Sowell also points out that in Malaysia, "where anti-Chinese discrimination is written into the Constitution" Chinese earn more on average than Malays. *Id.* at 20. The same basic notion is true for the Jews, Italians and Japanese. *Id.* at 20–21.

*basis* in evidence for [a municipal government to] conclu[de] that remedial action was necessary." *Id., compare Wygant,* 476 U.S. at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring) ("firm basis").

### 2. *The Constitutional Showing Needed to Justify the County Plan*

■ To justify an affirmative action plan, *"some showing* of prior discrimination by the government unit involved [must be made] before allowing the use of racial classifications in order to remedy such discrimination." *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847 (plurality opinion) (emphasis added). The plurality opinion goes on to say that *"Hazelwood [School Dist. v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)] demonstrates this Court's *focus on prior discrimination* as the justification for, and the limitation on, a State's adoption of race-based remedies." *Id.* at 275, 106 S.Ct. at 1847. Public employers, such as the County, "must identify ... discrimination, public or private, with some specificity before they may use race-conscious relief." *City of Richmond,* 109 S.Ct. at 727 (opinion of the Court). The problem with the statistical analysis in *Wygant* was that it compared the percentage of minority students to the percentage of minority teachers, basing the plan on a "role-model" theory. This was an improper statistical comparison. "[T]he proper comparison for determining the existence of actual discrimination by the school board was between the racial composition of the school's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market." *Id.*

This is instructive in the case before the Court. The relevant statistical labor pool to consider in this case must be the qualified pool in the community who possess the special skills necessary to be promoted to sergeant.

This could be argued to mean that only those minorities who have 3 years on the police force (3 years experience is one of the qualifications to take the sergeant's test) would be considered. This qualification is not insignificant because experience gained while serving as a patrolman cannot be simulated in a classroom or learned from a book. Such experience serves as a necessary proving ground for those who hope to move up in the ranks.[42] Additionally, especially with police officers who must be particularly sensitized to the many diverse circumstances required to protect the public, this 3 years of experience is invaluable. On closer examination, however, it may be necessary to consider whether this "qualification" is relevant for the constitutional analysis because there is no way one could obtain this qualification unless he was a member of the force. If there were discrimination in hiring, it is possible that minorities would have difficulty in obtaining 3 years on the force in a statistically relevant percentage. But that does not necessarily mean that the reason for any statistical underrepresentation was caused by, or was in any way attributable to, the County's racial preferences.[43] In the absence of evidence with some specificity to show prior discrimination in hiring by the County, how can the County hope to justify the promotion plan based on the raw general population statistical imbalance? The "relevant analysis in cases involving proof of discrimination by statistical disparity focuses on those disparities that demonstrate such prior governmental discrimination." *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847.

In *United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), the Court upheld a District Court order

---

**42.** In *Mayor v. Educational Equality League,* 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974), the Supreme Court said that it is not always the case that "it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded...."

**43.** For example, any disparity in minority representation may have been due to disinterest or lack of awareness of the opportunities available among minorities. Indeed, as late as 1984, the County began to "target[ ] the County's recruitment efforts in certain areas of the County that had relatively high minority population." D.I. 48. This appears to be evidence of the County's continuing efforts in recruitment techniques.

imposing a 50% hiring quota. The Alabama police department had, according to the District Court, been guilty of pervasive, systematic and obstinate discriminatory conduct and had for almost 4 decades excluded blacks from all positions, including jobs in the upper ranks. No governmental agency has made a similar finding against the County in this case. It was argued that the Alabama police department was found guilty only of discrimination at the hiring level and not in its promotional practices; therefore, no remedial relief was justified in the promotional context. The Supreme Court said "[t]here is no merit in either premise. Discrimination in the entry level necessarily precluded blacks from competing for promotions, and resulted in a departmental hierarchy dominated exclusively by nonminorities." *Paradise*, 480 U.S. at 168, 107 S.Ct. at 1065. This situation could only be explained by the department's "past discriminatory conduct." *Id.* (opinion of Brennan, J., joined by Marshall, Blackmun and Powell, JJ.).[44] Thus it becomes material whether there was discrimination by the County at the hiring level to address whether area labor force statistics could be utilized to show a sufficient basis in the record for the County to conclude that remedial action was necessary.

The County argues that *Paradise* indicates that general population statistics are appropriate in this case to provide the County with the necessary compelling interest to justify the County's adoption of the Plan. The situation presented by *Paradise* is, however, different from the present case. In *Paradise*, there was an actual finding that the police department had engaged in obstinate, pervasive, systematic and exclusionary hiring practices for 4 decades. No similar findings are present in the case *sub judice*. The EEOC findings dated May 31, 1978, with respect to Officer Snow's allegations did indicate that the Police Department had not met its burden of establishing that its "exclusionary testing device" was job related. Additionally, while that report stated it was

"reasonable to infer" that the Police Department "hires on the basis of race and that its promotional practices reflect that same bias", there is no question that the inference was based on general statistical disparities between minorities in the County and minorities in the County Police Department. D.I. 18, Ex.H. Also, as previously indicated, these findings, albeit based on general population statistical disparities, were sufficiently addressed prior to the adoption of the County Plan. The results show that the County was well on its way toward alleviating any statistical disparity present at the sworn officer level with its enhanced recruitment of minorities. Those efforts continued into 1984 when the County was discussing enhanced minority recruitment in high minority population areas of the County. Furthermore, the County had taken steps to comply with the lack of a validated promotional test years before Officer Bryant took the examination. *See* D.I. 18, Ex.J. Although ORS findings dated July 18, 1980, indicated that minorities were statistically underrepresented, it also found that the County's minority hiring and recruitment was sufficient for the County. The report did not state that there was a *prima facie* showing of racial discrimination in sworn officer positions. Significantly, the ORS noted that the total selection process "previously utilized" by the County revealed *no adverse impact* on *minority* candidates. D.I. 18, Ex.A. Also, a letter from the ORS to the County dated October 31, 1984, D.I. 18, Ex.D, stated that minority hiring in sworn officer positions actually exceeded labor force availability and the percentage of minorities on the eligibility list.

While the County may argue that the statistical imbalance in the percentage of sworn officers to the percentage of minorities in the community indicates past discrimination in hiring and that this discrimination in hiring serves as a predicate for the dearth of minorities qualified for command positions, the record before the Court

---

**44.** It should be noted that these quoted portions from *Paradise* only represents a plurality. Also, Justice Powell is no longer a member of the

Court. Chief Justice Rehnquist, and Justices White, O'Connor and Scalia dissented.

simply does not bear this out and the Court rejects the County's position on this point. The County has fallen into the same pitfall that formed the basis for much of the governmental agencies' conclusions; that is, if there are disparities in comparison with general population statistics, it must mean there was discrimination. To the contrary, the Supreme Court itself has indicated that there are many reasons for a statistical disparity other than discrimination. Furthermore, the documented, effective hiring initiative in place at the time of the adoption of the promotional Plan further serves to indicate that reliance on the *Paradise* plurality is misplaced in this case. The obstinate, systematic, pervasive and exclusionary discrimination found in *Paradise* is simply not present in this case and any statistical imbalances that may have existed, if at all pertinent, were being addressed in an ongoing, good faith successful manner.

Several cases have discussed the problems associated with using general population statistics as proof of discrimination sufficient to justify affirmative action plans in situations when hiring or promotion is made from a qualified pool of applicants. In *City of Richmond*, the Court indicated that absent admitted past societal discrimination it would be "sheer speculation" to attempt to determine how many minorities would be employed in a particular job type. *City of Richmond*, 109 S.Ct. at 724. In *City of Richmond*, the minority set aside program was adopted with reliance, in part, on an improper statistical analysis. The city did not "know how many MBE's in the relevant market are qualified to undertake prime or subcontracting work in public construction projects." *Id.* at 725. Because there was no evidence in the record of a statistical imbalance with respect to the qualified relevant minority labor pool (*i.e.*, subcontractors), the Court was unable to find a compelling interest to justify the set aside program based on statistical disparities. The Court also pointed out that evidence of low minority representation in local contractors' associations was not, in and of itself, indicative of prior discrimination by the

city. "There are numerous explanations for this dearth of minority participation, including past societal discrimination in education and economic opportunities as well as both black and white career and entrepreneurial choices. Blacks may be disproportionately attracted to industries other than construction." *Id.* at 726.

In another context, the Supreme Court found that the statistical comparison with the number of minority students in the area was inappropriate to supply a sufficient justification for the plan (*i.e.*, race preferential layoff of teachers) because it failed to address the qualified relevant area labor force. *Wygant*, 476 U.S. at 275–76, 106 S.Ct. at 1847–48 (opinion of Powell, J.) and at 292, 106 S.Ct. at 1856 (opinion of O'Connor, J.); *see also J. Edinger & Son*, 802 F.2d at 216 ("[t]here are a host of social, economic, personal, and demographic factors which may account for the statistical disparity").

■ In this case, the County offers the findings of federal agencies and the general population statistics upon which they were based as evidence sufficient to supply a compelling justification for the adoption of the promotion Plan. Addressing the first prong of strict scrutiny analysis, the County argues that the Plan was adopted because it had a firm basis to believe that remedial action was necessary. It argues that this evidence of "federal governmental findings of discrimination" shows that the County's employment practices "caused, at least, in part", the "substantial racial imbalances." D.I. 42 at 17–18. On the other hand, it argues that no actual showing of discrimination by the County is necessary to justify the Plan. D.I. 35 at 21. The Plaintiffs argue that the County is attempting to use societal discrimination as the justification for the County Plan. They also argue that there must be "an identification of specific discriminatory practices" perpetrated by the County before it can adopt a plan that satisfies the constitutional standard. D.I. 47 at 17. The Plaintiffs contend that neither the testimony of County "agents" nor a careful examination of the agency investigative findings reveal

such discrimination. Assuming, for present purposes, that this evidence was before the County and was actually considered in adopting the promotional Plan, an assumption on which there is no evidence but upon which both parties have relied, the Court finds that this evidence is insufficient to supply the requisite compelling justification.

A close analysis reveals that the federal agency findings were premised on disparities based on general population statistics, on disparities using improper pools or were inconclusive, thereby making them insufficiently compelling. The ORS Report of July, 1980, D.I. 18, Ex. A, which addressed allegations that the Police Department utilized discriminatory promotional practices, concluded that it was unable to draw any valid conclusions concerning the promotional procedures employed.[45] That same Report, based on general population statistics, concluded that minorities were underrepresented in sworn officer positions. It further stated, however, that recent hirings by the Police Department "demonstrated sufficient action taken by the County" in attempting to close the statistical gap. *Id.* In a letter from the Office of the Secretary of the Treasury dated October 31, 1984, based on general population data, it was concluded that "hiring of minority officers exceeded the labor force availability as well as the percentage of minorities on the eligibility list." *Id.*, Ex. D.[46]

In a letter dated May, 1978, the LEAA found, based on general population statistical comparison, that "it is reasonable to infer that [the County] hires on the basis of race and that its promotional practices reflect the same bias." D.I. 18, Ex. H. That LEAA letter also criticized the County's lack of a statistically validated promotional testing device for the Police Department. *Id.* In its Investigative Findings dated January, 1980, the LEAA, based on general population statistics, concluded that it was unable to "conclusively determine that race was a factor in the complainants not being promoted." D.I. 18, Ex. J, at 3. In a letter from the Office of the County Executive dated July 30, 1980, to the ORS, the County indicated that it would send a copy of its validated promotional examination later that fall. D.I. 18, Ex. K. In a Compliance Agreement with the ORS, the County agreed to submit a description of the new validated police promotional procedure no later than December 31, 1981. D.I. 18, Ex. L. Finally, the County Plan was adopted by the County on April 24, 1984. D.I. 18, Ex. M.

Considering all reasonable inferences favorably to the County, this evidence cannot, as a matter of law, be regarded as a compelling justification for the adoption of the County Plan here in issue. The most that can be said is that as of May, 1978, the EEOC inferred that the Police Department hired on the basis of race and that consequently its promotions reflected that disparity but this conclusion was based on general population statistics which the Supreme Court has repeatedly indicated will not suffice where the job in issue requires special qualifications or skills. *See, e.g., City of Richmond,* 109 S.Ct. at 725. It appears that the federal agency motivations were driven by a desire to obtain a representative proportion of minorities in the Police Department at both the sworn officer and command position levels. These goals, albeit altruistic, are not a sufficient basis to support a finding of a compelling justification for the County Plan. There is simply an absence of an appropri-

---

**45.** Interestingly, the ORS Report noted that the County was in the process of adopting a validated promotional test. Furthermore, the County had been making interim promotions on a 6 month basis until the test was effective and 50% of the interim promotions went to minorities (2 of the 4).

**46.** That letter also indicated that minorities were trained in parity with their work force representation. It also indicated that the Coun-

ty was still in the process of establishing a recruitment program to increase minority representation. The County has represented that it had continually revised and supplemented its recruitment efforts throughout 1980 to 1984. In 1984, for example, the County was discussing narrowly targeted minority recruitment efforts into those areas of the County with high minority population densities. D.I. 48, 1990, by stipulation made a part of the record.

ate statistical analysis to justify the County Plan.[47] Furthermore, the reasonable inferences in favor of the County show that the only other criticism of the Police Department's promotional scheme was the lack of a statistically validated promotional examination. That criticism was made in May of 1978. There is no evidence to refute the County's representation that it was in the process of alleviating that concern at least as early as June of 1981.[48] *See* D.I. 18, Ex. K. There is no evidence of any other indicia of past discrimination by the County that could have formed the appropriate "basis" necessary to conclude that the adoption of the Plan was compelled by the situation or was reasonably necessary. *Wygant*, 476 U.S. at 293, 106 S.Ct. at 1857 (O'Connor, J., concurring); *City of Richmond*, 109 S.Ct. at 727.[49]

Summary judgment is appropriate on the issue of the compelling interest to justify the County Plan. There is an absence of material factual dispute on the issue of whether there was a firm basis for the County to conclude that remedial action was necessary when it adopted the Plan. Since the Court is confronted with cross-motions for summary judgment, the Court must view each motion on its own basis, *Rains*, 402 F.2d at 245, construing the facts and reasonable inferences derived most favorably to the nonmoving party. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. Taking all reasonable inferences most favorably to the County, the record does not support a finding that the County had a sufficiently compelling basis to conclude that race-based remediation was necessary. Accordingly, the Plaintiffs are entitled to summary judgment on this issue and the County is not.

**3.** *Narrowness of the County Plan's Fit*

The second prong of the strict scrutiny standard requires the Court to determine if the affirmative action plan was narrowly tailored to achieve the compelling state interest. Justice Powell's concurring opinion in *Paradise* is instructive on the factor's the Court will look to in determining whether a plan is sufficiently narrowly tailored. These factors are:

> (i) the efficacy of alternative remedies; (ii) the planned duration of the remedy; (iii) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force; (iv) the availability of waiver provisions if the hiring plan could not be met; and (v) the effect of the remedy upon innocent third parties.

*Paradise*, 480 U.S. at 187, 107 S.Ct. at 1075 (Powell, J., concurring). With regard to waiver provisions, these are favored by the courts because they set no rigid, inflexible requirements but rather allow for fine tuning based on the particularized circumstances confronting the employer. In addressing whether a program, such as the one struck down in *City of Richmond*, is narrowly tailored to serve a compelling state interest, the Court should inquire into whether the local legislature considered "the use of race-neutral means to increase minority" participation. *City of Richmond*, 109 S.Ct. at 728. In *City of Richmond*, for example, the Supreme Court noted that there was no evidence in the record that the Richmond City Council considered any alternatives to the racial quota adopted. *Id.*[50] *Cf. Bernal v. Fainter*, 467 U.S. 216, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984) (as general matter, where strict scru-

**47.** The statistics offered by the County do not change this conclusion. *See, e.g.,* D.I. 42, Ex. A. Those statistics are not appropriately focused on the qualified, appropriately skilled labor pool and as such must be rejected. The Constitution requires much more particularized statistics than those offered by the County to justify the Plan.

**48.** The Sergeant's Promotional Process validation study was dated December of 1980. D.I. 34A at 38.

**49.** The Court notes that no additional evidence that the County had engaged in past discrimination in its promotional practices other than that which has been discussed has been produced.

**50.** The Court also noted that in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), Congress did carefully consider and reject race-neutral alternatives prior to settling on the set-aside program. *Id.*

tiny review applies, least restrictive means analysis attaches); *City of Richmond,* 109 S.Ct. at 734 ("the strict scrutiny standard will operate in a manner generally consistent with the imperative of race neutrality, because it forbids the use even of narrowly drawn racial classifications except as a last resort") (Kennedy, J., concurring).

If, for the sake of argument, the Court assumes for present purposes that there was a compelling interest for the County to have adopted the Plan, the Plan must have been narrowly tailored to achieve that goal. In this case, the effect of the Plan is to place members of the protected class on the certified promotion list even if no protected class members scored high enough on the validated testing procedure to have earned that status. The purpose offered for the County's adoption of the Plan is that it was designed to eliminate a statistical imbalance in the number of protected class members in command positions as compared to the number of protected class members in the County area labor force. The County submits that there were no alternate means of achieving the County's minority promotion goals that were less intrusive to the rights of non-protected class members. The County reaches this conclusion arguing that race is "only" a consideration in a promotion process. D.I. 42 at 28.

The Plaintiffs bear the ultimate burden of showing that the Plan was not sufficiently narrowly tailored. *See Wygant,* 476 U.S. at 293, 106 S.Ct. at 1857 (O'Connor, J., concurring). The Plaintiffs argue that a more narrowly tailored affirmative action program could have been devised. They also argue that the burden of the Plan "is visited solely and exclusively on the named plaintiffs." D.I. 47 at 22. They argue that unlike the remedy approved in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the County Plan is not "widely dispersed" and that the burdens it places on non-minorities are not sufficiently insignificant to fall outside of constitutional protections. *Id.*

A recent Ninth Circuit opinion is instructive on the narrowness of the fit that an affirmative action plan needs in order to pass constitutional muster. In *Higgins v. City of Vallejo,* 823 F.2d 351 (9th Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989), the Ninth Circuit found the plan at issue in that case sufficiently narrowly tailored to further the compelling interest in remedying the city's proven past racial discrimination in employment. The city's plan provided that the top 3 scoring individuals on the promotional exam were certified for promotion consideration. The plan allowed race to then be considered as one consideration in the final determination in making the promotion decision. The city's plan allowed race to be a consideration only if it was consistent with the merit principle. The court concluded that the city's plan was "a minimally intrusive means to achieve racial balance and is thus a narrowly tailored remedy.... The affirmative action plan merely allows race to be considered as among employees who are otherwise *fully* qualified for the promotion." *Id.* at 359–60 (emphasis added). It is obvious that the *Higgins* plan is distinguishable from the County Plan; the County Plan arbitrarily places such a person on the certified list. This approach renders the validated promotion process nugatory and tends to foster notions of racial inferiority. It unfortunately also sends the message that minorities cannot make the grade on their own. *See City of Richmond,* 109 S.Ct. at 721 (opinion of O'Connor, J., joined by Rehnquist, C.J. and White and Kennedy, JJ.); *id.* at 739 (opinion of Scalia, J.) ("Racial preferences appear to 'even the score' (in some small degree) only if one embraces the proposition that our society is appropriately viewed as divided into races, making it right that an injustice rendered in the past to a black man should be compensated for by discriminating against a white. Nothing is worth that embrace."); *id.* at 733 (recognizing the danger that certain race-based legislation "stigmatizes the disadvantaged class [ (in this case nonminorities) ] with the unproven charge of past racial discrimination, [and] it actually imposes a greater stigma on its supposed beneficiaries"); *University of California Regents v. Bakke,* 438 U.S. at 298, 98 S.Ct.

at 2752 ("[P]referential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relation to individual worth"); *Fullilove*, 448 U.S. at 545, 100 S.Ct. at 2809 (Stevens, J., dissenting) ("a statute of this kind inevitably is perceived by many as resting on an assumption that those who are granted this special preference are less qualified in some respect that is identified purely by their race [and] can only exacerbate rather than reduce racial prejudice"); *United Jewish Organizations v. Carey*, 430 U.S. 144, 173-74, 97 S.Ct. 996, 1013-15, 51 L.Ed.2d 229 (1977) (Brennan, J., concurring in part) ("preferential treatment may act to stigmatize its recipient groups, for although intended to correct systemic or institutional inequities, such a policy may imply to some the recipients' inferiority and especial need for protection").

It appears to this Court that the County could have adopted a plan similar to the *Higgins* plan and, therefore, have adopted a less intrusive, more narrowly tailored plan. The plan in *Higgins*, while not completely race-neutral, was less intrusive on non-protected class members than the County Plan. If race were only considered as a "plus" in the sense of the Harvard type plan endorsed in *Bakke*, 438 U.S. at 316-17, 98 S.Ct. at 2761-62 (opinion of Powell, J.) among those individuals who scored in band 1, the County Plan would more closely mirror the plan accepted in *Higgins*.[51] Cf. *Johnson*, 480 U.S. 616, 107 S.Ct. 1442 (gender considered as a plus among similarly qualified applicants for a promotion acceptable in Title VII case). Such a plan would allow closer adherence to 9 Del.C. § 1451(f)(3) which requires that promotions be based on "competency and fitness ... [as] ascertained by ... competitive examination" to be utilized "when possible" in promotions. *See also* 9 Del.C. § 1183(a)(1) (disapproving of racial-prefer-

ences) and Police Department Affirmative Action Plan, Goal # 2 (minorities promoted in same manner as others provided validated promotion process exists). This is especially so in light of the fact that all those who score in band 1, while having a range of scores, are considered equally qualified within the parameters of the statistical banding process. *See supra*, n. 9.

In this case, considering the number of vacancies for sergeant promotions in the County's relatively small Police Department[52] and that there were no less than 10 certified candidates prior to supplementation under the Plan, there were more than enough candidates to fill the vacancies that would occur. The variations in each individual's grades within a particular band suggests a degree of qualification more nearly approximating the "similarly qualified" individuals that were competing for promotions in *Johnson* or admissions in *Bakke*. If the validated promotion process was admittedly and uncontrovertedly designed to objectively test for the particular promotion in question, then a failure to utilize it by ignoring the bands is merely an exercise of arbitrary and subjective racial preference. Making candidates for promotion "certified" or "as nearly equal" utilizing catch phrases from Supreme Court precedent cannot mask the reality of the situation. It is the substance of the Plan which is at fault.

The Court is also of the opinion that the County already had in effect a more narrowly tailored plan than the promotional Plan presently challenged. The County was already committed to a promotional process based on a statistically validated objective promotional procedure. This commitment was made at least as early as June of 1981 as part of a Conciliation Agreement with the ORS. D.I. 18, Ex. L. The County also had taken sufficient action in hiring minorities to meet its affirmative action burdens as indicated in the attach-

---

**51.** Nothing in the record indicates that the County considered such a plan.

**52.** In this regard the Court is compelled to note that the statistics reveal that in 1980 there were 42 command positions occupied and in 1984

there were 47 command positions occupied. Two of these 5 additional positions were filled by minorities. Put another way, 40% of the additional positions were held by minorities.

ment to the July, 1980, letter from the ORS. D.I. 18, Ex. A. The attachment to the letter indicated that of the recent hirings for sworn officer positions, 28.6% were minorities. As of October, 1984, for example, the County's recruitment of minorities actually exceeded minority representation in the area labor force and the eligibility list. D.I. 18, Ex. D. For the year of 1984, up to October, the percentage of minorities hired for sworn officer positions was 36%. *Id.* While the adoption of the promotion Plan predates this finding by some 6 months, the County was certainly on notice that its increased attention to minority recruitment was already meeting with significant success. *See, e.g.,* D.I. 18, Ex. A. Furthermore, the County had devoted considerable efforts to seek new programs to increase minority representation in the Police Department. Even assuming that increased recruitment at the sworn officer level may have been enough, standing alone, the County could also have resorted to heretofore approved instructional seminars to ensure improved test results by minorities. Certainly this is not the only race neutral means to solve what the County considers a problem. But as far as this record is concerned, there is no evidence that any other remedy was considered. The only evidence submitted to support the constitutionality of the Plan was the Plan itself. In that light, the county merely ignored the undeniably promising results gleaned from the raw statistics. These efforts, if given time to develop, would likely have adequately addressed any imbalances.[53] *See, e.g., supra,* n. 52. In that sense, the County had evidence before it of a less intrusive means, a more narrowly tailored means to solve what it considered a problem.

The Court has considered the full record in this case.[54] As was the case in *City of*

*Richmond,* "there does not appear to have been any consideration of the use of race-neutral means to increase minority ... participation" in the County Police Department in general and the command positions in particular. *City of Richmond,* 109 S.Ct. at 728. If these were in the form of the hiring goals, certainly it must be conceded that the promise of its effectiveness was never given a chance to reach maturation or ultimate success. The County already had in place a validated promotional process which furthered the merit based promotional scheme set for the County Police Department. The County also had a 50% hiring goal which was geared towards increasing minority proportions at the sworn officer level and eventually, all things being equal, at the command position level. Assuming the existence of a compelling interest for purposes of assessing the narrow tailoring of the Plan, the Court concludes that there are less racially burdensome alternatives available to have addressed the alleged compelling interests asserted by the County. Accordingly, the County Plan fails to satisfy both the first (compelling interest) and the second (narrow tailoring) prongs of strict scrutiny review.

Our goal, like that of our brethren on the bench, is to attain a society free of the prejudices and bigotry which marked, indeed marred, the early centuries of this grand republic. *See* A. Bickel, *The Morality of Consent* 133 (1975), *quoted in City of Richmond,* 109 S.Ct. at 735 (Scalia, J., dissenting) ("The lesson of the great decisions of the Supreme Court and the lesson of contemporary history have been the same for at least a generation: discrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society."); Rosenfeld, *Decoding Richmond, supra,* note 34 at

**53.** As the Supreme Court has previously indicated " 'nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.' " *Wygant,* 476 U.S. at 275, 106 S.Ct. at 1847 (plurality opinion), *quoting Hazelwood,* 433 U.S. at 307, 97 S.Ct. at 2741, *quoting International Brotherhood of*

*Teamsters v. United States,* 431 U.S. 324, 340, n. 20, 97 S.Ct. 1843, 1856, n. 20, 52 L.Ed.2d 396 (1977).

**54.** In disposing of the equal protection issues in this case, the Court has also considered those facts offered by the County but not stipulated to by the Plaintiffs.

1749 ("all the Justices share the notion that the ultimate fulfillment of constitutional equality lies in the establishment of a truly color-blind society"). In the process of that quest, the courts must be unswervingly dedicated to its eradication. But unbridled aggressiveness in obliterating the vestiges of those inherent wrongs must be tempered by the constraints of the Constitution otherwise we unwittingly embark on a new kind of prejudice. Protection is only afforded by confining our review of state action within the parameters of Supreme Court precedent requiring narrowly tailored remedies. If the result appears to infer some lesser dedication to our goals, the impression is misconstrued. Rather it is this uncompromising support of the equal protection clause that guarantees its viability. The Plaintiffs' motion for summary judgment on both prongs of the equal protection review is therefore granted and the County's cross-motions are denied in this regard.

## C. *Title VII*

In *Johnson,* the Supreme Court rejected the theory that Title VII and the equal protection clause impose identical burdens on a public employer. *Johnson v. Transportation Agency,* 480 U.S. at 627–28 n. 6, 107 S.Ct. at 1449–50 n. 6. "The fact that a public employer must also satisfy the Constitution does not negate the fact that the *statutory* prohibition with which that employer must contend was not intended to extend as far as that of the Constitution." *Id.* (emphasis in original); *see generally* Daly, *Some Runs, Some Hits, Some Errors—Keeping Score in the Affirmative Action Ballpark From Weber to Johnson,* 30 B.C.L.Rev. 1 (1988). While generally a court will attempt to avoid decision on a constitutional basis if another basis for decision can be found, *see, e.g., Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2996–97, 86 L.Ed.2d 664 (1985); *Hayes v. City of Wilmington,* 451 F.Supp. 696, 704 (D.Del.1978), the affirmative action standards are, as *Johnson* indicates, different. Because the Court has decided that the County Plan does not satisfy the constitutional equal protection standard, it is un-necessary to decide whether the statutory standard is satisfied.

## D. *Sections 1981 and 1983*

The Plaintiffs allege violation of section 1983 based on their rights to due process and equal protection of the laws secured by the constitution. D.I. 1, ¶¶ 21, 23. The Plaintiffs also allege that the County "unlawfully denied plaintiffs ... employment promotions based upon their race, white, in violation of the Constitution ... and [section] 1981." D.I. 1, ¶ 18.

### 1. *Section 1983*

Section 1983 provides no substantive protections of its own, rather, it refers to "deprivation[s] of any rights, privileges, or immunities secured by the Constitution and laws...." 42 U.S.C. § 1983. The Plaintiffs allege the violation of the equal protection clause as the predicate for their claim for recovery under section 1983. Because the Court has determined that the Plaintiffs' constitutional rights have been violated pursuant to the equal protection clause, it is not necessary to address the due process argument. The question is moot. Therefore, the County's motion seeking summary judgment on the section 1983 claim is denied.

### 2. *Section 1981*

■ Section 1981 provides "all persons ... [with] the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981. The Supreme Court has held that the protections afforded by section 1981 are not limited to blacks but extend to whites as well. *McDonald v. Sante Fe Transportation,* 427 U.S. 273, 286–87, 96 S.Ct. 2574, 2581–82, 49 L.Ed.2d 493 (1976). Recently, the Supreme Court has held that "[w]here an alleged act of discrimination does not involve the impairment of [the 'making and enforcement' of contracts], § 1981 provides no relief." *Patterson v. McLean Credit Union,* ——

U.S. ——, ——, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989). Furthermore, the court reiterated Justice White's dissenting words in *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), saying that:

> [O]ne cannot seriously "contend that the grant of the other rights enumerated in § 1981 [that is, other than the right to 'make' contracts,] *i.e.*, the rights 'to sue, be parties, give evidence,' and '*enforce* contracts' accomplishes anything other than the removal of *legal* disabilities to sue, be a party, testify or enforce a contract. Indeed, it is impossible to give such language any other meaning." 427 U.S. at 195, n. 5 [96 S.Ct. at 2606, n. 5]. ... (dissenting opinion) (emphasis in original).

*Patterson*, 109 S.Ct. at 2373. The Court also distinguished between the types of conduct actionable under section 1981 and Title VII. While certain conduct is covered both by Title VII and section 1981, section 1981 only covers discriminatory "conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." *Id.* at 2374.[55] *See also Jones v. United States Postal Service*, C.A. No. 89–399–CMW, slip op. at 10, 1990 WL 5198 (D.Del. Jan. 26, 1990) (Wright, J.).

The Court also addressed the "different" situation of discrimination in the *failure to promote* an individual. *Patterson*, 109 S.Ct. at 2377. The Court said that:

> [T]he question whether a *promotion* claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the *opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981*. In making this determination, a lower court should give a fair and natural reading to the statutory phrase "the same right ... to make ... contracts," and should not strain in an undue manner the language of § 1981. *Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981. Cf. Hishon v. King & Spauling*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (refusal of law firm to accept associate into partnership) (Title VII).

*Patterson*, 109 S.Ct. at 2377 (emphasis added). In *Patterson*, since the promotion claim had not been argued, the Court did not address the issue further. The Plaintiffs in this case have not offered any evidence to show that a promotion to sergeant would entail the entering of a new contract or a new and distinct relation between themselves and the County. Unlike the situation of a law partnership referred to in *Patterson* where an associate who is "promoted" to or accepted as a partner and thus obtains an equity stake in the law firm as well as taking on increased the parties do not change. Furthermore, the Plaintiffs were not absolutely precluded from obtaining a promotion to sergeant nor did the County "refuse" to promote the Plaintiffs. It decided to promote other individuals. Accordingly, the County's motion for summary judgment on section 1981 is granted.

## III.  CONCLUSION

The Court grants the County's motion for summary judgment with respect to the Plaintiffs' claims under section 1981. The Court grants the Plaintiffs' motion for summary judgment with respect to the equal protection clause violation. The County Plan is therefore declared unconstitutional. Because the Court finds that the Plaintiffs have been denied equal protection of the laws in violation of the Fourteenth Amendment to the Constitution, the County's motion for summary judgment on

---

**55.** The Court noted that where both Title VII and section 1981 cover the discriminatory conduct, "the detailed procedures of Title VII are rendered a dead letter, as the plaintiff is free to pursue a claim by bringing suit under § 1981 without resort to those statutory prerequisites." *Patterson*, 109 S.Ct. at 2375. This answers the County's assertion that the standards for a section 1981 claim are identical to those for a Title VII claim. D.I. 18 at 21 n. 22.

the Plaintiffs' section 1983 claim is denied.[56]

56. The Court declines to render a decision as to the alleged unconstitutionality of the County Plan under the due process clause to the fourteenth amendment. The Court's determination that the Plan is unconstitutional under the equal protection clause of the fourteenth amendment renders a decision on due process grounds unnecessary to the disposition of this case.