Patrick **HIGGINS**, Plaintiff-Appellant,

v.

**CITY OF VALLEJO,**
Defendant-Appellee.

No. 86–1904.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 1987.

Decided July 29, 1987.

Alan C. Davis, San Francisco, Cal., for plaintiff-appellant.

Michael H. Roush, Vallejo, Cal., for defendant-appellee.

Before CHOY, PREGERSON and CANBY, Circuit Judges.

PREGERSON, Circuit Judge:

Appellant Patrick Higgins, a white male, filed a reverse discrimination suit against the City of Vallejo, California ("the City"). In his complaint, Higgins alleges that the hiring of Errol Cooley, a black male, instead of Higgins for the position of firefighter/engineer violates the City's Charter and other local laws, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, and the equal protection clause of the fourteenth amendment to the United States Constitution. The district court

granted summary judgment for defendants on all claims, and we affirm.

## BACKGROUND

In December of 1983, a firefighter/engineer position became available in the Vallejo fire department. Patrick Higgins and Errol Cooley, ordinary firefighters in the department, both decided to apply for promotion to the firefighter/engineer position. Along with numerous other firefighters, they took a competitive written examination and three practical examinations. The applicants were ranked according to their performance on the examinations. At the time when the position became available, Higgins ranked first, with a score of 94.17 out of 100, and Cooley ranked third, with a score of 93.09.

The City charter vests the power of appointment to various City positions in the city manager. The chief of the fire department recommended to the city manager that Higgins be granted the promotion to firefighter/engineer. The city manager instead promoted Cooley because the selection of Cooley was consistent with the City's affirmative action plan.[1]

The Vallejo Firefighters Union, Local 1186, AFL–CIO, filed a grievance on behalf of Higgins concerning the promotion of Cooley. The grievance alleged that Cooley's promotion violated the labor agreement between the Union and the City. The arbitrator found no violation of the labor agreement. Higgins then filed this action in the district court alleging violations of local law, Title VII, the California constitution, and the United States Constitution. Both parties filed motions for summary judgment. The district court granted defendants' motion for summary judgment on the ground that the promotion of Cooley was consistent with local laws, federal statutes, and the state and federal Constitutions. Higgins appeals on all issues except the state constitutional issue.

## DISCUSSION

We review de novo district court orders granting summary judgment. *Darring v.*

Kincheloe, 783 F.2d 874, 876 (9th Cir.1986) (citing *Lojek v. Thomas,* 716 F.2d 675, 677 (9th Cir.1983)); *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986). This court's review is governed by the same standard used by the district court under Fed.R.Civ.P. 56(c). *Darring,* 783 F.2d at 876. We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### I. *Vallejo City Charter and Other Local Laws*

Appellant Higgins argues that by promoting Cooley the City violated the City charter and the City affirmative action ordinance. Because appellant's argument would require us to disregard the underlying purpose of the City's legitimate affirmative action plan and to read the City's laws as inconsistent with one another, we reject it.

The City charter provides for the hiring of City employees and sets forth the basic principle that race should not be considered in employment decisions if such consideration is inconsistent with the merit principle. Section 500 of the charter lists the powers and duties of the city manager, which include the appointment of City employees. At Section 800, the Charter provides that "[a]ll appointments shall be based on ability and experience as determined by tests and records of achievement." The City's Civil Service Commission rules provide that after applicants for a promotion have taken various competitive examinations, their names should be placed on a list in rank order, with extra points given for seniority and veteran status. Once the list is compiled, the names of the top three applicants are certified. The city manager may grant the promotion to any of the certified individuals.

---

1. Cooley was promoted to firefighter/engineer in December 1983. In February 1986, Higgins was promoted to firefighter/engineer as well.

This action is not moot, however, because it affects back pay, benefits, and seniority rights.

The City Charter stresses the importance of the merit principle. Section 803 states that the City Council shall create a "modern system of personnel administration" that includes provision for:

    a.  an orderly system of positive recruiting and competitive examinations for entrance to the civil service, *free of all political, religious, racial and other considerations not consistent with the merit principle,* and properly advertised;

    b.  a system for promotions within the service based on competitive examinations or demonstrated merit as shown by records of performance and seniority, or some combination thereof....

(Emphasis added.)

When the City promoted Cooley in 1983, the City's affirmative action plan consisted of a resolution passed in July 1982 and an ordinance adopted in September 1982. An investigation conducted by the California Fair Employment Practices Commission before the plan was adopted indicated that the City's employees were not representative of the racial makeup of the City's population.

The July 1982 resolution stated:

It is the goal of the City of Vallejo to hire and to promote within the City Government at the various levels of compensation and in the various groups of classifications such that the racial or ethnic and gender composition of the City Government work force will be consistent with the racial and gender composition of the City, as established by the 1980 Census for the City of Vallejo.

*Implementation of the City's goal will be achieved by a hiring and promotion policy aimed at minorities and women that includes a rate in excess of their proportion in the population of the City.*

(Emphasis added.)

The September 1982 ordinance stated the same goal of equal employment opportunity, but also reaffirmed the City's adherence to the merit principle. Among the ordinance's statements of findings and declarations was this provision:

B.  The Council of the City of Vallejo continues to declare its intention to accomplish this goal of equal employment opportunity within the framework of the City Charter which requires an orderly system of positive recruiting and competitive examinations for entrance to the civil service of the City of Vallejo, and for advancements and promotion in the Civil Service based upon competitive examinations or demonstrated merit as shown by records of performance and seniority or some combination thereof, *free of all political, religious, racial and other considerations not consistent with the merit principle.*

The district court's unpublished disposition contains a well-supported and well-reasoned analysis of the intricacies of the charter, the ordinance, and the resolution and of the relationship among them. The court cites the basic rule of harmony in statutory interpretation, *see Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981), and the strong presumption of validity for municipal laws, *see City of Industry v. Willey,* 11 Cal.App.3d 658, 663, 89 Cal.Rptr. 922, 924 (1970).

■  The district court correctly concluded that a harmonious reading of the City's charter, Civil Service Commission rules, and affirmative action plan indicates that promotions should be granted only to qualified individuals, but that race may be used as an additional factor in selecting among a group of qualified candidates. Under this reading, promotions are to be "based on" merit, but the City may also consider additional factors that are consistent with the merit principle. Race is one such additional factor.

■  Appellant's argument that local law prohibits a consideration of race is based on the unsupported premise that taking race into consideration is inconsistent with the merit principle. The City's mandate that appointment "be based on ability and achievement" does not preclude consideration of an applicant's race. In addition, appellant assumes that the merit principle

requires giving a promotion to the applicant with the highest numerical test score. The Civil Service Commission rules do not require an absolute devotion to test scores. The rules do not require the city manager to select the highest ranking eligible candidate; instead, the city manager retains discretion to choose among the top three. As the City's affirmative action ordinance indicates, the City wanted to achieve equal opportunity, but did not want to sacrifice quality in its work force. The promotion of Cooley is in accord with these goals. Thus, the promotion of Cooley does not violate the City charter or the City affirmative action plan.

## II. *Title VII*

█ Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2(a) provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Plaintiff bears the burden of showing that the City's affirmative action plan violates Title VII. *Johnson v. Transportation Agency, Santa Clara County*, —— U.S. ——, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987). We hold that, under *Johnson*, Higgins has not carried his burden.

This case, like *Johnson*, fits within the analytic framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972). Under *McDonnell Douglas*, once a plaintiff in a Title VII action establishes a prima facie case that race or sex has been considered in the employment decision, the burden shifts to the employer to show a legitimate nondiscriminatory reason for the decision; an affirmative action plan can be one such reason. *Johnson*, 107 S.Ct. at 1449. Once the employer satisfies this requirement, the burden shifts back to the plaintiff to show that the asserted nondiscriminatory reason is a pretext and that the affirmative action plan is invalid. *Id.*

The City concedes that when the city manager hired Cooley instead of Higgins, he took their respective races into consideration. Thus, appellant has established a prima facie case of discrimination. The City has alleged that it decided to promote Cooley rather than Higgins pursuant to the City's affirmative action plan. Because, as stated above, we hold that the decision to promote Cooley conforms with the City's affirmative action plan, the City's burden of establishing a nondiscriminatory reason for the employment decision is satisfied.

It remains, then, for Higgins to show that the City's affirmative action plan is invalid. The Supreme Court set out standards of invalidity in *United Steelworkers of America v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979). In *Johnson*, the Court applied *Weber's* standards to a case much like the one before us.

In *Johnson*, Diane Joyce and plaintiff Paul Johnson were both highly experienced road workers for the County of Santa Clara. They both applied for promotion to a road dispatcher position. Out of seven applicants receiving the required score of 70 or above, Johnson tied for second with a score of 75, and Joyce placed fourth with a score of 73. Joyce was granted the promotion pursuant to a County affirmative action plan designed to achieve a long-range goal of parity between the sexes. The Supreme Court concluded that the promotion of Joyce was permissible because it was made pursuant to an affirmative action plan that is "fully consistent with Title VII, for it embodies the contribution that voluntary employer action can make in eliminating the vestiges of discrimination." *Johnson*, 107 S.Ct. at 1457.

## A. *Manifest Imbalance*

The first issue the Court considered in analyzing whether the affirmative action plan in *Johnson* complied with Title VII was whether the employment decision at issue "was made pursuant to a plan prompted by concerns similar to those of the employer in *Weber*." *Id.* at 1452. The Court restated this issue as "whether consideration of the sex of applicants for skilled craft jobs was justified by the existence of a 'manifest imbalance' that reflected underrepresentation of women in 'traditionally segregated job categories.' " *Id.* (quoting *Weber*, 443 U.S. at 197, 99 S.Ct. at 2724). The Court held that the County of Santa Clara faced a serious deficiency of women in its work force and that the County's plan allowing sex to be considered as between two qualified applicants for promotion was the County's attempt to remedy this deficiency.

■■ The City of Vallejo has likewise satisfied this first requirement of *Johnson*. The City's affirmative action plan was passed after the California Fair Employment Practices Commission conducted an investigation of the City's employment practices and determined that minorities were conspicuously lacking in the City's work force. The FEPC's 1973 report found that while the City's population was approximately 30 percent minority, only 11.4 percent of the municipal work force was minority. Similarly, while approximately 17 percent of the population was black, only 7.3 percent of the municipal work force was black. The report also found that blacks earned considerably less money than whites. In addition, the FEPC report criticized the City for employing personnel practices that facilitate discrimination.

The record also shows a racial imbalance within the City fire department. The first black fire department employee was not hired until 1964. Between 1964 and the issuance of the FEPC report in 1973, only two other blacks received jobs with the fire department. Between 1972 and December 1983, forty-seven firefighters were hired, of whom only five were black. In that period, thirty-six individuals were promoted to fire captain; only one of those individuals was black. In the history of the fire department, only three blacks, one of whom was Cooley, have ever held the position of firefighter/engineer.

The available evidence further shows that the affirmative action plan was adopted as a result of the FEPC's investigation. For example, a September 22, 1972 memo from the City Manager to the City Counsel states:

> As Council will recall, the California Fair Employment Practices Commission is conducting an investigation of the City's hiring practices. I have directed [the City Attorney] to prepare a draft of an Affirmative Action Program which will comply with present Federal and State law....

Similarly, in a letter written on October 6, 1972 that accompanied the proposed affirmative action ordinance, the City Attorney wrote:

> The attached ordinance establishing an Affirmative Action Employment Program is submitted for your consideration. Its purpose is to bring the City of Vallejo into compliance with the requirements of the Federal Civil Rights Law of 1964 as amended in March 1972.
>
> \* \* \* \* \* \*
>
> As Council knows the urgency for Vallejo to adopt a meaningful Affirmative Action Program is based on the present FEPC investigation. If such a program is not adopted in the very near future many of our federally funded programs may be in jeopardy. The City might find itself involved in lawsuits which could be costly not only in terms of staff time and money, but in good community relations as well.

In the light of this evidence, we conclude that *Johnson*'s requirement that the affirmative action plan be responsive to a manifest imbalance in the workforce is satisfied.

## B. *Effects on Non-Minorities*

The second issue addressed by the Supreme Court in *Johnson* is whether the

effect of Santa Clara County's affirmative action plan "on males and non-minorities is comparable to the effect of the plan in [*Weber* ]." *Johnson,* 107 S.Ct. at 1452. Employing language from *Weber,* the Court restated this issue as "whether the Agency Plan unnecessarily trammeled the rights of male employees or created an absolute bar to their advancement." *Id.* at 1455.

In support of its conclusion that the County of Santa Clara's affirmative action plan was no more disadvantageous to males and non-minorities than that in *Weber,* the Court cited several factors. First, the plan established no quotas. The plan "merely authorizes that consideration be given to affirmative action concerns when evaluating qualified applicants." The court stated that the Santa Clara County affirmative action plan was akin to the "Harvard Plan" approved by Justice Powell in *University of California Regents v. Bakke,* 438 U.S. 265, 316–19, 98 S.Ct. 2733, 2761–63, 57 L.Ed.2d 750 (1978), which allows race to be considered as a factor in establishing diversity. As in *Bakke,* the court stated, *"No·* persons are automatically excluded from consideration; *all* are able to have their qualifications weighed against those of other applicants." *Johnson,* 107 S.Ct. at 1455 (emphasis in original). The affirmative action plan established by the City of Vallejo is similarly free of rigid quotas and discriminatory exclusions. Only qualified employees are considered for promotions, and all applicants are entitled to compete against all others. Once the pool of qualified applicants is assembled, the City may take race into account in rendering its final decision.

The second factor the Court cited in concluding that Santa Clara County's affirmative action plan had a sufficiently limited effect on males was that Paul Johnson, the plaintiff, "had no absolute entitlement to the road dispatcher position" because the Agency Director was authorized to grant the promotion to any of the seven qualified applicants. *Id.* Thus, the County's decision to hire Joyce uprooted no "legitimate firmly rooted expectation" on the part of Johnson. *Id.* Similarly, in this case plaintiff Higgins had no absolute entitlement to the position of firefighter/engineer because the city manager had discretion to choose among the top three applicants. Those top three applicants each had some hope of promotion, but none had a legitimate expectation of promotion.

The third relevant factor discussed by the Court in *Johnson* was that, while being denied a discrete promotion, plaintiff Johnson retained his job, his salary, his seniority, and his eligibility for future promotions. *Id.* 107· S.Ct. at 1455–56. In this case, too, plaintiff retained his job as firefighter, his salary, and his seniority. He also retained his eligibility for future promotions, as indicated by the fact that he was promoted to firefighter/engineer in February 1986.

The final factor the Supreme Court considered regarding the effect of the Santa Clara County plan was the fact that it "was intended to *attain* a balanced work force, not to maintain one." *Id.* at 1456 (emphasis in original). Higgins contends that because the plan in this case fixes no deadline for achieving racial parity, the plan is not sufficiently temporary under *Weber.* However, in *Johnson,* the Supreme Court stated that an express assurance that a program is temporary is unnecessary when the employer "has sought to take a moderate, gradual approach to eliminating the imbalance in its work force, one which establishes realistic guidance for employment decisions, and which visits minimal intrusion on the legitimate expectations of other employees." *Id.* We hold that the City of Vallejo has provided ample evidence that its affirmative action plan is a temporary program designed to attain racial balance. The affirmative action plan states that "it is the City's intention to *accomplish* this goal of equal employment opportunity." (Emphasis added). The City's plan provides for consideration of race only insofar as the merit principle can be preserved, making it a moderate and gradual remedy. The plan minimizes the disruption of employees' expectations by providing clear guidelines for when race may be taken into account. We conclude that the City's af-

firmative action plan is sufficiently temporary under *Weber* and *Johnson*.

■ We hold that, like the County of Santa Clara's affirmative action plan in *Johnson,* the City of Vallejo's affirmative action plan is in full conformity with Title VII.

### III. *Equal Protection*

■ Higgins contends that the promotion of Cooley violates the equal protection clause of the fourteenth amendment to the United States Constitution. We hold that the promotion, made pursuant to the City's affirmative action plan, satisfies even the most rigorous equal protection requirements.

The Supreme Court has consistently recognized that "government bodies constitutionally may adopt racial classifications as a remedy for past discrimination." *Local 28 of Sheet Metal Workers Int'l Ass'n v. Equal Employment Opportunity Commission,* —— U.S. ——, 106 S.Ct. 3019, 3052, 92 L.Ed.2d 344 (1986) (plurality opinion). However, as Justice Brennan stated for the plurality in *Sheet Metal Workers,* the members of the Court have not agreed on the appropriate test to be applied in analyzing whether a race-conscious remedial measure is constitutional. *Id.* In that case, however, the plurality held that the affirmative action plan in question "passes even the most rigorous test—it is narrowly tailored to further the Government's compelling interest in remedying past discrimination." 106 S.Ct. at 3053. We need venture no view on the appropriate standard to be applied in this case because we hold that the City's plan also passes the most rigorous test for equal protection as set forth in *Sheet Metal Workers.*

Under this "least common denominator" strict scrutiny standard, a government agency's affirmative action plan is valid only if the agency had a compelling interest in remedying past discrimination. This requirement is not satisfied by a general showing of societal discrimination. Rather, the Supreme Court has required a showing of prior discrimination by the governmental unit whose affirmative action plan is under

scrutiny. *Wygant v. Jackson Board of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986). As indicated in our discussion of Title VII, the record provides abundant evidence that the City of Vallejo engaged in past discrimination. The state's FEPC report indicates that the City's municipal workforce suffered a serious racial imbalance and that this imbalance was caused, at least in part, by the City's employment practices. The report also contained implied threats of legal action by the FEPC if the City did not take affirmative steps to remedy the racial imbalance.

The City's plan is narrowly tailored to achieve racial balance. The plan does not force the city manager to promote individuals solely because of their race. Under the plan, after taking a competitive examination, the top three qualified applicants are ranked according to their numerical test scores. The plan then allows the city manager to consider race as one of any number of factors when deciding whom to appoint among the three certified applicants.

The City's plan is similar to the "Harvard Plan" for university admissions that Justice Powell approved in *University of California Regents v. Bakke,* 438 U.S. 265, 316–19, 98 S.Ct. 2733, 2761–63, 57 L.Ed.2d 750 (1979). Under the Harvard Plan, "[w]hen the Committee on Admissions reviews the large middle group of applicants who are 'admissible' and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor." *Id.* at 316, 98 S.Ct. at 2761. Justice Powell noted that:

> In such an admissions program, race or ethnic background may be deemed a "plus" in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats.... In short, an admissions program operated in this way is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight....

This kind of program treats each applicant as an individual in the admissions process. The applicant who loses out on the last available seat to another candidate receiving a "plus" on the basis of ethnic background will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname.... His qualifications would have been weighed fairly and competitively, and he would have no basis to complain of unequal treatment under the Fourteenth Amendment.

*Id.* at 317–18, 98 S.Ct. at 2762–63.

As the district court noted, the City has accorded race the same role as accorded by the Harvard admissions process. In City promotion decisions, all candidates compete on equal footing. The top three candidates, selected through a merit-based process, are all deemed qualified for promotion. The system then invests discretion in the City Manager to choose among these three, allowing him to use various factors, including race, in making his decision. This "plus" system accords each applicant the equal treatment contemplated by the "Harvard Plan."

Significantly, Vallejo's plan does not use layoffs to achieve its goals. In *Wygant,* the Supreme Court indicated that layoffs are a disfavored means of achieving racial balance. *Wygant,* 106 S.Ct. at 1851. In that case, the Jackson, Michigan board of education amended its collective bargaining agreement with its teachers' union in such a way that it required layoffs of tenured nonminority teachers before layoffs of untenured minority teachers. When layoffs became necessary, this practice was followed. The displaced nonminority teachers brought suit alleging an equal protection violation.

The Court in *Wygant* noted that "[w]e have recognized ... that in order to remedy the effects of prior discrimination, it may be necessary to take race into account," *id.* at 1850, but then concluded that the school board's layoff approach was too intrusive a means of limiting discrimination. In *Wygant,* the Court discussed at length the peculiar harm inherent in the use of layoffs to remedy prior discrimination. Citing *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), which held that Congress' allocation of ten percent of its public works contracts to minority business enterprises is constitutionally permissible, the Court stated that Congress' action in that case was appropriate in part because it imposed a relatively light burden on nonminorities. *Wygant,* 106 S.Ct. at 1850–51 (citing *Fullilove,* 448 U.S. at 484, 100 S.Ct. at 2778). The Court stated:

Significantly, none of the cases discussed above [including *Fullilove*] involved layoffs.... We have previously expressed concern over the burden that a preferential layoffs scheme imposes on innocent parties.... In cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.

．　 ．．　 ．　 ．　 ．

While hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives. That burden is too intrusive. We therefore hold that, as a means of accomplishing purposes that otherwise may be legitimate, the Board's layoff plan is not sufficiently narrowly tailored. Other, less intrusive means of accomplishing similar purposes—such as the adoption of hiring goals—are available. For these reasons, the Board's selection of layoffs as the means to accomplish even a valid purpose cannot satisfy the demands of the Equal Protection Clause.

*Id.* 106 S.Ct. at 1851–52 (emphasis in original).

The City's plan concerning the promotion of qualified minority employees is a mini-

mally intrusive means to achieve racial balance and is thus a narrowly tailored remedy. These promotion guidelines are even less intrusive than hiring goals. Like hiring goals, promotion guidelines visit a minor burden on nonminority employees. But unlike hiring goals, promotion guidelines do not require that an individual bear the burden of past discrimination to the extent that he or she is denied a livelihood. All of the City's employees who are denied promotion retain their existing jobs, salary, and seniority. The affirmative action plan merely allows race to be considered as among employees who are otherwise fully qualified for the promotion. Because the plan is narrowly tailored to further the City's compelling interest in remedying past discrimination, we conclude that the hiring of Cooley under the plan does not violate the equal protection clause.

We AFFIRM the district court's order of summary judgment for defendants on all claims.