[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This administrative appeal questions the decision of the Commission on Human Rights and Opportunities ("CHRO"), which found that the State of Connecticut Department of Transportation ("DOT") discriminated against the co-defendant, Carol Smith ("Smith") on the basis of her sex. Smith had filed a complaint on October 5, 1988 with CHRO which alleged violations by DOT of Connecticut General Statutes §§ 46a-60(a)(1), 46a-60(a)(4),46a-70(a) and 46a-58(a) and Title VII of the Civil Rights Act of 1965, Title 42 United States Code, § 2000e et seq. Smith amended her complaint on October 10, 1989, and charged employment discrimination based on gender and in retaliation for her CT Page 2819 previously having filed a complaint against DOT under General Statutes § 46a-82.
Smith's complaint was investigated by a CHRO investigator, who found reasonable cause to believe that a violation occurred, attempted unsuccessfully to conciliate the matter and, upon failure of conciliation, on March 27, 1991, certified the complaint to public hearing. On April 23, 1992 Helen Z. Pearl, a CHRO hearing officer, was appointed to act as presiding officer. By agreement of the parties, the matter was bifurcated into a liability hearing and a hearing in damages, if necessary. The liability hearing lasted fourteen days, commencing January 12, 1993 and continuing on January 26, 1993, February 3, 1993, March 2, 1993, March 11, 1993, May 26, 1993, June 17, 1993, June 25, 1993, August 3, 1993, August 12, 1993, October 6, 1993, December 16, 1993, December 17, 1993, and February 8, 1994. During the hearing numerous exhibits were entered into evidence and numerous witnesses testified. The CHRO hearing officer made extensive findings of facts which included:
 4. Complainant Carol L. Smith (hereinafter "SMITH") is a white female.
 5. Respondent DOT is an agency of the State of Connecticut. See CONN. GEN. STATS. Titles 13a and 13b.
 6. Respondent DOT operates airports at Bradley International Airport in Windsor Locks, CT and at Brainard Airport in Hartford, CT.
 7. DOT is required to develop an affirmative action plan. CONN. GEN. STAT. § 46a-68-31 et seq.
 9. DOT's affirmative action plan is required to include short-term and long-term hiring goals aimed at increasing the representation of "protected class" members in DOT's work force. R.C.S.A. § 46a-68-41.
 10. DOT is required to file with CHRO a proposed affirmative action plan for CHRO's review and approval or disapproval. CONN. GEN. STAT. § 46a-68(c) and (d).
14. In 1987, DOT submitted a proposed affirmative action plan to CHRO which reviewed the proposed affirmative action plan, found certain deficiencies, provided DOT with CT Page 2820 comments and, in response, DOT revised its 1987 affirmative action plan. Kilbon, Tr. 6/25/93, pp. 979-980; Jedrzwieski, Tr. 10/6/93, pp. 1462-1475; Taplin, Tr. 12/17/93, pp. 1702-1712.
 15. The 1987 affirmative action goals for the aforesaid entire category which included but was not limited to Protected Services Trainee (Fire) were short term goals of 1 black male and 1 Hispanic male and long term goals of 1 white female and 1 Hispanic female. Comp. Ex. 28; Kilbon, Tr. 9/17/93 at 980; Tr. 8/12/93 at 1197;
 16. The 1988 affirmative action goals for the entire category which included but was not limited to protective Services Trainee (Fire) were short term goals of 1 white female, 2 black males and 1 Hispanic male; no long term goals for 1988 were stated. Comp. Ex. 16; Comp. Ex. 28; Kilbon, Tr. 12/17/93 at 986; Tr 8/12/93 at 1198.
 22. The continuous recruitment employment eligibility list is an "unranked" list of persons passing the written examination for Protective Services Trainee (Fire) administered by the Department of Administrative Services. Although the list is arranged in the order of test scores, the position of the name on the list does not establish a priority. See CONN. GEN. STAT. § 5-216; Tulin, Tr. 12/16/93 at 1544.
23. Rafael Mendoza is an Hispanic male.
24. Jeffrey Spring is a white male.
 25. Mendoza and Spring as well as Complainant SMITH took and passed the examination for Protective Services Trainee (Fire) which was promulgated on March 29, 1988. Comp. Ex. 10.
 26. In 1987-1988, only one person out of approximately 41 members (including the chief) of the Bradley Airport Fire Department was a woman, namely Deborah Strong. Comp. Ex. 28; Buonome, Tr. 1/12/93 at 52-54.
27. In Spring 1988, there were no Hispanics employed in the Crash Fire unit at Bradley Airport, Comp. Ex. 28; Robert, Tr. 3/2/93 at 592, and in 1987 and 1988, there were three CT Page 2821 black males. Comp. Ex. 28; Buonome, Tr. 1/12/93 at 53.
 28. In May 1988, there were three or four vacancies for Protective Services Trainee (Fire) at Bradley Airport, although only one position ultimately was filled as a consequence of the May 1988 selection process. See Robert, Tr. 3/2/93 at 541-542; Buonome, Tr.
 32. A three member panel was established to interview the candidates for Protective Services Trainee (Fire) and to make recommendations. Captain Shelley Pace, Jr., who is a black male, chaired the panel and Captain James Shea, III and Firefighter-Paramedic Guy Henry also served on the panel. See Comp. Ex. 8.
 34. As a successful exam candidate, on or about April 28, 1988 Complainant SMITH was notified by mail to telephone to request an interview if she was interested in a future vacancy within the Fire Crash Section at Bradley International Airport. Comp. Ex. 18; Tr. 12/16/93 at 1564; See Tr. 3/2/93 at 529.
 35. Kenneth Robert made inquiry to the DOT affirmative action coordinator Margo Kilbon concerning the affirmative goals for the Hartford area protective services airport crash fire rescue; Kilbon emphasized that 1987 goals had not been met so it was important to meet the goals. Robert, Tr. 3/2/93 at 549-550; Comp. Ex. 7, p. 3.
 36. 70 candidates were interviewed on May 6, 7, 9, 10 and 11, 1988. Comp. Ex. 6.
 39. It is unclear whether, based on his conversation with Margo Kilbon, Ken Robert advised the interview panel as to the 1987 affirmative action goals which carried over into 1988, See F.O.F. ¶ 11, or the 2/1/88 — 1/31/89 goals to be submitted in May 1988, subject to approval or revision by CHRO by mid-August 1988, or both sets of goals. See Kilbon, Tr. 8/12/93 at 1199; Robert, Tr. 3/2/93 at 550.
40. It is clear that when Kenneth J. Robert drafted a memorandum to Edward Archibald, Deputy Commissioner of the Bureau of Aeronautics for the signature of Mr. Robert's supervisor, Robert Juliano, Bradley CT Page 2822 International Airport Director, Robert, Tr. 3/2/93 at 548, under date of June 6, 1988, recommending the hiring of Rafael Mendoza, Robert restated both the 1987 and the 1988 affirmative action goods and, in doing so, restated the goals for both years incorrectly. Compare F.O.F. ¶ 15 and F.O.F. ¶ 16 with Comp. Ex. 7, p. 3; Kilbon, Tr. 8/12/93 at 1197-1198; Jedrziewski, Tr. 10/6/93 at 1470.
 41. Although there is no priority within short term goals or within long-term affirmative action goals, the affirmative action documents themselves list white females before they list black males or Hispanic males, see e.g. comp. Ex. 28, Comp. Ex. 16. Robert changed the sequence and listed 1 white female last when stating, (inaccurately) the affirmative action goals for 1988 and in his testimony. See Comp. Ex. 7.
 42. The actual hiring decision clearly was made after the formulation of the 1988 hiring goals, which goals were applicable. See Comp. Ex. 7 dated 6/6/88; F.O.F. ¶ 11.
 44. The letter to exam candidates who qualified for Protective Service Trainee — Fire requested that interviewees bring a written background information sheet with their educational background and "any experience you may have which may be helpful in this position." Comp. Ex. 18.
 45. Being an EMT (emergency medical technician) is not a requirement for the entry level protective services trainee position, Buonome, Tr. 1/12/93 at 41, but the FAA requires the presence of an EMT or paramedic on each shift, so the department tries to keep 8-12 paramedics as firefighters. See Robert, Tr. 3/2/93 at 553; Shea, Tr. 2/8/94 at 1735-1736. New employees will be trained as EMT's if they are not already qualified. Pace, Tr., 12/17/93 at 1633, 1635; see Buonome, 1/12/93 at 39.
46. Although job training is available for an entry level protective services trainee position, "EMT" and also "Fire School" are listed under "Requirements" on Capt. Pace's list of interview questions. Note that "Requirements" does not mean pre-requisites and applies to the requirements of the job itself Resp. Ex. D. See
Pace, Tr. 12/17/93 at 1635. Also note that various CT Page 2823 memoranda drafted by Capt. Pace included capsule summaries of 15 candidates and indicated which candidates already had EMT or paramedic experience.
 47. Speaking Spanish is not a requirement for the entry level protective services trainee position, see Comp. Ex. 1, but was considered to be a bonus because of"the fact that at the airport we had many Hispanics passing through the airport, passengers and meeters and greeters at the airport and I thought it would be a good idea to have a Spanish speaking person on staff." Robert, Tr. 3/2/93 at 536.
 48. Although non-Hispanics speak Spanish, non-Hispanic interview candidates were not asked whether or not they spoke Spanish. Robert, Tr. 3/2/93 at 607.
 49. Many women pass through the airport as passengers or meeters or greeters but that was not considered to be "bonus" reason to hire a female. See Robert, Tr. 3/2/93 at 593.
 51. Capt. Shelly Pace, Jr., who chaired the interview panel, testified that Ken Robert directed him to hire affirmatively and that he was told the order of preference was a black male first, then a Hispanic male and, lastly, a woman in that order. Pace, Tr. 12/17/93 at 1657; Id. at 1640.
 52. Capt. Shea, another member of the interview panel, understood from panel chair Pace that the board was mandated to hire a minority, which Shea believed at that time meant a black or a Hispanic but did not include a white female. Shea, Tr. 2/8/94 at 1737, 1747, 1777-8, 1781, 1785.
 53. Further, Capt. Shea testified that Capt. Pace's instructions were "that we had to put experience and education aside and hire a minority, just based on being a minority." Shea, Tr. 2/8/94 at 1748, 1786.
54. A second interview with the panel and Chief Buonome was given to Bertram Robinson, the only black male on the list of the top 15 candidates "because we were going to hire him," Pace, Tr. 12/17/93 at 1655; but the CT Page 2824 second interview with Robinson was not successful. See
Pace, Tr., 12/17/93 at 1622-1624; Shea, Tr. 2/8/94 at 1740, 1754.
 55. After eliminating the black male candidate, the screening panel then turned to Hispanic male candidates. Pace, Tr. 12/17/93 at 1624.
 56. The references of the first Hispanic male candidate did not check out, in that he did not live or work where he had said he did, so he was eliminated on that basis without a second interview. See Pace, Tr. 12/17/93 at 1624-1625; Shea, Tr., 2/8/94 at 1740, 1741.
 57. The interview panel then set up a second interview with Rafael Mendoza, an Hispanic male, which second interview [w]as attended by Ken Robert and Chief Buonome. Robert, Tr. 3/2/93 at 545-546; Buonome, Tr., 1/26/93 at 211.
 58. Hiring either a white female or a Hispanic male as Protective Services Trainee (Fire) at Bradley Airport in June 1988 would have achieved an affirmative action objective to the same extent. Comp. Ex. 28; Jedrziewski, Tr. 10/6/93 at 1474-1476.
 59. Under date of May 15, 1988, Chief Buonome was embroiled in a dispute concerning staffing levels, and wrote a memorandum concerning fire fighter vacancies. Comp. Ex. 8. The Chief categorized the acceptable candidates into three groupings; minority candidates, non-minority candidates, and female candidates (one of whom was named "Jay", a nongender specific name). Id. Chief Buonome noted 3 vacancies and recommends hiring 4 persons, listed in alphabetical order, the first 3 of whom are white males and last mentioned is Rafael Mendoza, identified as a minority. The chief's 5/15/88 memo also recites the Affirmative Action goal as "one Black or
Hispanic candidate must be hired first" (emphasis supplied) which misstates both the 1987 and the 1988 goals. See F.O.F. No. 15; F.O.F. No. 16.
60. Under date of 5/27/88, Capt. Shelly Pace, Jr., as chair of the interview panel, wrote an interdepartmental memo to Kenneth J. Robert, listing the top 15 candidates, with brief comments about each one, including but not limited CT Page 2825 to both Rafael L. Mendoza and Carol L. Smith, and recommending, based upon interviews, resumes and work experience, the hiring of Rafael L. Mendoza as the "top rated Minority Candidate." Comp. Ex. 6.
61. Rafael Mendoza was hired on or about June 27, 1988.
 62. Mendoza's score on the 3/29/88 eligibility exam was 60, Comp. Exh. 10, and, at the time of his interview, he did not have a college degree, had no fire fighter or EMT or paramedic training or experience, did not believe he was qualified for the job and was very surprised that he got it. Comp. Exh. 4; Mendoza, Tr., 1/26/93 at 278, 281, 304.
 63. Complainant Smith's score on the 3/29/88 eligibility exam was 74, Comp. Exh. 10, and, at the time of her interview, she had a bachelor's degree, a paramedic certificate, job experience as a nurse's aide, as a paramedic, and as a firefighter. Comp. Exhs. 3, 6, 7; Smith, Tr. 12/16/93 at 1550-1552, 1569.
 64. Six white males had been hired in July and August 1987 as Protective Services Trainee (Fire) in the Bradley Fire Department, Comp. Exhs. 14, 14a, several of whom (Timothy Hughes, Robert Goldberg, and Jonathan Hibbord) were not on the allegedly applicable eligibility list promulgated 5/27/87, see Resp. Exh. C, and whose employment applications were dated the very same day they were hired. Compare Comp's Exhs. 13E, 13F, 13(G) with Comp. Exs. 14 and 14A. Such hires appear to have been done by an improper employment process. See
Taplin, Tr., 12/17/93 at 1717-1719. Tulin, Tr. 12/16/93 at 1499, 1509, 1510-1511, 1548; See Comp. Ex. 25.
 65. Carol Smith herself had been interviewed in July 1987 but when she complained about failure to be hired, the successful defense was that she was ineligible for hire because the prior eligibility list on which her name appeared had expired and she was not on the then current, more recently promulgated eligibility list.
66. Respondent DOT hired Jeffrey Spring for the newly established position of Protective Services Trainee (Fire) at Brainard Airport on April 22, 1988. Comp. Exhs. 5, 14, 22, 32. CT Page 2826
 67. Jeffrey Spring had been working at Brainard Airport as a DOT Maintainer III and he was the only applicant interviewed, Comp. Exh. 22, after William Colacrai, then general aviation coordinator, contacted personnel to inquire whether Jeff Spring was on the eligibility list. Colacrai, Tr., 2/3/93, 378, 418.
 68. Although the hiring of Jeffrey Spring for the newly created entry level trainee position was reported as a "promotion", see Comp. Exhs., 14, 14a, 32, it was more in the nature of a reclassification, see Tulin, Tr. 12/16/93, 1520, which at that time required taking the same competitive exam and going through the exact same process that an outside candidate would have had to go through, inasmuch as there was absent anything in state personnel rules or regulations that authorized a preference for an inside versus outside candidate. Id. at 1520-1521.
 69. Jeffrey Spring was hired by Respondent for the Protective Services Trainee (Fire) position at Brainard Airport without regard to affirmative action goals. Colacrai, Tr., 2/3/93, at 400.
 70. The Respondent is the State of Connecticut Department of Transportation, which includes but is not limited to both the Bradley Airport Fire Department and Brainard Field.
 71. Deborah Strong was the only woman assigned to the Bradley Fire Dept. from 1984 until she transferred laterally to the University of Connecticut Health Center in 1990. Strong, Tr., 8/12/93 at 1227; Buonome, Tr., 1/12/93 at 54; Comp. Ex. 14, 14a, 28.
 72. Deborah Strong testified that, when she was interviewed initially by Chief Buonome in 1984, he several times expressed uncertainty Bradley Fire Department was ready for a woman and that they were going to have trouble dealing with a woman within the fire department. Strong, Tr., 8/12/93 at 1239.
73. During the 1988 interview process, Deborah Strong commented to Chief Buonome, "Wouldn't it be nice if another woman got hired?" He replied that that would be CT Page 2827 like putting oil on a hot fire or putting hot oil on a fire, Strong, Tr. 8/12/93 at 1258, which referred to the problems Strong herself then was having at Bradley. Id. See Comp. Ex. 19.
 74. Deborah Strong complained about her lack of training and of harassment by other firefighters, some of which was gender-based and related to her being the first female in the fire department. See Comp. Ex. 19, Robert, Tr., 3/2/93, at 558-568.
 78. Pamela Horan, who served as Personnel Officer II with the Dept. of Transportations Affirmative Action Office from July 1988 until January 1993, Horan, Tr. 3/11/93 at 616-617, investigated a complaint by Deborah Strong. Comp. Ex. 19. Horan described the Bradley Fire Department a "guy shop", Comp. Ex. 25, Horan, Tr. 3/11/93 at 717; Ex. 25, met with Ken Robert in December 1988 and emphasized the need to hire a woman in the Bradley Fire Department when filling the next vacancy, Comp. Ex. 25, and gave a presentation to the entire department concerning affirmative action and sexual harassment. Comp. Ex. 25, Tr. Robert, 3/2/93 at 567.
 79. In 1988, the atmosphere at Bradley Fire Department was not hospitable to women, Shea, Tr. 2/8/94 at 1763-64; see
Comp. Ex. 19, F.O.F. 74, 75, 76, 77, which was building up, "like a volcano ready to explode." Shea, Tr. 2/8/94 at 1781.
 80. Chief Peter Buonome's testimony was not credible in multiple respects, particularly when he testified that he was not aware of any reasons why Deborah Strong wanted a transfer. See Comp. Ex. 19; Buonome, Tr., 1/12/93 at 55. He also vacillated in his reasons for not hiring Carol Smith when he discussed the matter with a representative from the DOT affirmative action office. Comp. Ex. 25; Horan, Tr. 3/11/93 at 729-731; 754-756.
 81. Chief Buonome was credible when he testified that at interviews, he was looking for "peaceful coexistence" among firefighters, Buonome, Tr. 1/26/93 at 248, and that, looking back, his biggest problems were people getting along with people. Id. at 255.
CT Page 2828
82. There was a need for more trained paramedics in Spring 1988 in the Bradley Airport Fire Department, yet Complainant Smith was bypassed in favor of untrained and inexperienced Mendoza. See Shea, Tr. 2/8/94 at 1736; Buonome, Tr. 2/3/93 at 349; Strong, Tr. 8/12/93 at 1248.
(Memorandum of Decision As to Liability, Case No. 89-40128, September 22, 1995).
On September 22, 1995, the hearing officer issued a memorandum of decision which found that DOT had discriminated against Smith on the basis of sex. Subsequently, a hearing in damages was held on September 26, 1996, and relief ordered in a memorandum of decision dated February 24, 1997. In this administrative appeal, brought pursuant to General Statutes §4-183, DOT contends that the liability decision was made contrary to law, without substantial evidence, and with egregious procedural errors.
It is quite clear that the scope of this Court's review of an agency's decision is very restricted. Pet v. Dept. of HealthServices, 228 Conn. 651, 660 (1994). General Statutes § 4-183(j) provides that "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . [i]n violation of constitutional or statutory provisions; . . . made upon unlawful procedure; . . . [or] clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. . . ." Where a question of law is presented to the court which previously has not been subjected to judicial scrutiny, the agency's interpretation of the law is not entitled to deference. Bridgeport Hospital v.Commission on Human Rights and Opportunities, 232 Conn. 91, 110
(1995). "[I]t is for the courts, and not for administrative agencies, to expound and apply governing principals of law."Id., 109.
In addition, judicial review of administrative fact finding requires the "court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from CT Page 2829 those facts are reasonable." Dolgner v. Alander, 237 Conn. 272,280 (1996); Connecticut Light and Power Company v. Department ofPublic Utility Control, 216 Conn. 627, 639 (1990). "The substantial evidence test assumes that an agency's decision is not tainted by procedural irregularities that implicate the validity of the decision itself" Adriani v. Commission on HumanRights and Opportunities, 220 Conn. 307, 327 (1991).
And, when a court reviews an agency's decision, the court must determine whether the agency has acted "unreasonably, arbitrarily, illegally or abused its discretion." Ottochian v.Freedom of Information Commission, 221 Conn. 393, 397 (1992). "[A]n agency is not required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." (Internal quotation marks omitted.) Briggs v. State Employees Retirement Commission,210 Conn. 214, 218 (1989).
In the present case, DOT advances four specific arguments in support of its contention that the CHRO hearing officer's decision should be reversed. First, DOT contends that the hearing officer's decision hinges upon a single erroneous conclusion, that is, that the June 1988 hiring of Rafael Mendoza was governed by DOT's 1988 affirmative action short term goals of two black males, one Hispanic male and one white female, rather than DOT's 1987 affirmative action short term goals of one black male and one Hispanic male. DOT contends that:
 If the 1988 goals apply, then hiring Carol Smith would satisfy the short term goals as well as hiring Rafael Mendoza. But if the 1987 goals applied, then hiring an Hispanic male satisfied the short-term goal whereas hiring a white female would only satisfy the long-term goal.
Plaintiff's brief, p. 13.
Pursuant to General Statutes § 46a-68(a), all state agencies are required to develop and implement an affirmative action plan in accordance with regulations adopted by the CHRO. These regulations are found in §§ 46a-68-31 to 46a-68-74 of the Regulations of Connecticut State Agencies. These plans include hiring or promotion goals, based on a comparison between the representation of groups in the work force with their representation in the pool of persons qualified for such employment in the relevant labor market area Regs. Conn. State CT Page 2830 Agencies §§ 46a-68-38 to 46a-68-40. Goals are set if here is a shortfall between the two figures and there are sufficient positions so that persons of a particular group statistically would be expected to be found in the work force. Regs. Conn. State Agencies § 46a-68-41. Section 46a-68-41a provides that "[g]oals . . . shall be established within timetables designated as long term or short term." Under § 46a-68-31 (ll), a short term timetable is a period of one year. Thus, a short term goal is a goal which is to be achieved within one year. And, since a long term time table is for a period longer than one year, but not exceeding five years under § 46-68-31(y), a long term goal is a goal that is to be achieved in more than one but not more than five years.
DOT is required to file its affirmative action plan on May 15 of each year. CHRO may approve or disapprove the plan within ninety days under General Statutes § 46a-68(d). Relying on § 46a-68-32(b) of the Regulations of Connecticut State Agencies, DOT argues that its May 1988 plan was not actually a plan until the CHRO approved it in August 1988 and, accordingly, when Mendoza was hired in June 1988, the goals from the May 1987 plan were in effect.
However, § 46a-68-54(a) provides:
 For agencies filing affirmative action plans annually, information reported therein shall be for the period commencing on the first day of the month (15) months prior to the date upon which the plan is to be filed and ending on the last day of the month (3) months prior to the filing.
The goals from DOT's May 1987 plan were to be achieved during the new plan year, which ran from February 1, 1987 to January 31, 1988. When DOT filed its May 15, 1988 plan, short terms goals obtained in the May 15, 1987 plan had expired three months earlier. Accordingly, the short term goals from the May 15, 1987 plan were no longer valid when DOT hired Mendoza in June, 1988.
DOT's 1988 plan was required to report on DOT's achievement of goals from the 1987 plan. Under § 46a-68-48, DOT was required, as part of its May 1988 plan, to "prepare a narrative report on all activity undertaken to achieve the hiring . . . goals contained in the previous affirmative action plan." If DOT's goals from the 1987 plan were not appreciably achieved, CT Page 2831 CHRO could consider that factor in its review of DOT's 1988 plan. Regs., Conn. State Agencies § 46a-68-59.
These regulations carry the force and effect of statute.Savage v. Aronson, 214 Conn. 256, 267 (1990). Thus, there was no "carry over" of the May 15, 1987 short term goals into the May 15, 1988 plan. There should have been simply reporting on those goals. New goals were to be set in the 1988 plan to be achieved during the new plan year, commencing February 15, 1988 and continuing to February 14, 1989. DOT's contention that the goals from the 1988 plan did not become effective until the affirmative action plan was approved in August 1988 is unavailing. This Court finds that the CHRO hearing officer correctly determined that the 1988 goals controlled the hiring of Mendoza.
DOT's second argument is that the hearing officer's decision ignored settled law by overturning a hiring decision that followed a valid affirmative action plan. DOT contends that at the CHRO hearing Smith failed to meet her burden of showing both that DOT's hiring pursuant to its affirmative action plan was pretextual and that the plan itself was invalid. The plaintiff concedes that the hearing officer correctly determined that this matter should be decided on the disparate treatment standard set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and reiterated in Texas Dept. of Community Affairs v. Burdine,450 U.S. 248, 253 (1981). Under the McDonnell Douglas — Burdine
burden shifting standard, a complainant must prove by a preponderance of the evidence the following elements: "(1) that he or she belongs to a protected class; (2) that he or she applied and was qualified for the position in question; (3) that despite his or her qualifications, the individual was rejected; and (4) that after the individual was rejected, the position remained open." Ann Howard's Apricots Restaurant. Inc. v.Commission on Human Rights and Opportunities, 237 Conn. 209, 225
(1996). Once the hearing officer determined that Smith had met her prima facie burden, the burden of production shifted to the employer to "produce evidence that the complainant was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Levy v. Commission on Human Rights andOpportunities, 35 Conn. App. 474, 481 (1994), aff'd.,236 Conn. 96 (1996). However, the complainant at all times retains the burden of persuasion that the defendant intentionally discriminated against the complainant. Ann Howard's ApricotsRestaurant. Inc. v. Commission on Human Rights and Opportunities, supra, 237 Conn. 225. In the present case, both in its brief and CT Page 2832 at oral argument, DOT relied heavily on the argument that as a matter of law, the existence of an affirmative action plan provides a non-discriminatory rationale for an employment decision under Johnson v. Transportation Agency, 480 U.S. 616,627 (1987), which the CHRO hearing officer found. The plaintiff correctly argues that under Johnson, where an affirmative action plan is advanced "as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid." Id., 626.
In the present case, the hearing officer rejected the Johnson
requirement that to overcome an employer's legitimate compliance with an affirmative action plan, a complainant must prove that the reliance upon the plan was pretextual and the plan was not valid. The hearing officer found:
 Respondent's reliance upon language on Johnson v. Transportation Agency, Santa Clara City. Col., id. which suggests that in order to prevail, a Plaintiff must prove that an affirmative action plan is invalid (as well as a pretext) is inapposite. Johnson clearly is distinguishable in two important respects: the Plaintiff Johnson, who lost his case and the job to a protected class member, was not himself a member of a protected class; and, the successful candidate in the Johnson case had approximately comparable qualifications for the job as compared to the unsuccessful Plaintiff.
(Memorandum of Decision As to Liability, p. 22)
The hearing officer found that DOT's reliance upon its affirmative action goals was a pretext for intentional discrimination against Smith. However, the hearing officer's decision failed to address the second prong of the Johnson test, that is, that where the employer's stated reason is valid compliance with its affirmative action plan the complainant must prove not only that the employer's reliance upon the plan is pre-textual, but also that the plan is invalid. Under Johnson, reliance upon an affirmative action plan is not treated as an affirmative defense with the employer required to prove its validity; but the complainant retains the burden of proving the plan's invalidity. Johnson v. Transportation Agency, supra,480 U.S. 626-27. See also Wygant v. Jackson Board of Education,476 U.S. 267, 277-78 (1986); Higgins v. City of Vallejo,823 F.2d 351, 355 (9th Cir. 1987), cert. denied, 489 U.S. 1051 (1989); CT Page 2833Cunico v. Pueblo School Dist. No. 60, 917 F.2d 431 (10th Cir. 1990).
Again, in the present case, the healing officer held that DOT's reliance on Johnson v. Transportation Agency was inapposite, stating: "Johnson clearly is distinguishable in two important respects: the Plaintiff Johnson, who lost his case and the job to a protected class member, was not himself a member of a protected class; and, the successful candidate in the Johnson
case had approximately comparable qualifications for the job as compared to the unsuccessful Plaintiff." (Memorandum of Decision As To Liability, p. 22). Neither is a proper basis to distinguishJohnson, which is the controlling case law. The fact that both the successful and unsuccessful job candidates were members of protected classes is irrelevant to the validity of DOT's affirmative action plan. And the fact that the successful candidate in Johnson had approximately comparable qualifications for the job as compared to the unsuccessful plaintiff there, is likewise unpersuasive. In the present case, both candidates were qualified for the job in question. Thus, the foundation on which the hearing officer attempted to distinguish Johnson, is insufficient. As stated by the Court in Cunico v. Pueblo SchoolDist. No. 60, supra, 917 F.2d 436:
 Whether discriminatory action taken under an affirmative action plan is challenged as an equal protection or a Title VII violation, the ultimate burden of proving the invalidity of the plan rests with the party challenging its validity. Wygant v. Jackson Bd. Of Educ., 476 U.S. 267, 277-78, 106 S.Ct. 1842, 1848-49, 90 L.Ed.2d 260 (1986) (equal protection; plurality opinion); Johnson, 107 S.Ct. at 1449 (Title VII).
In the hearing before the CHRO hearing officer, the complainant Smith did not demonstrate that the DOT's affirmative action plan was invalid. The record contains no substantial evidence from which such a conclusion could be drawn. Moreover, the CHRO hearing officer made no finding, pursuant to Johnson, that Smith had proven that the plan was invalid.
The hearing officer did make extensive findings concerning the plaintiff's track record in affirmative hiring. Suffice it to say that DOT would not be a candidate for poster child for affirmative action hiring according to the evidence adduced at the hearing, which dealt with past hiring practices. However, what was important in the instant case, was the hiring of one CT Page 2834 member of a protected class, Rafael Mendoza, over Smith, a member of another protected class. Since DOT advanced and proved that Mendoza had been hired pursuant to its affirmative action plan, it was incumbent upon Smith to prove not only that reliance on the affirmative action plan was pretextual, but also that the affirmative action plan itself was invalid. Again, Smith failed to produce substantial evidence that DOT's affirmative action plan was invalid. Under Johnson v. Transportation Agency, supra, Smith failed to meet her burden of proof. The CHRO hearing officer's finding that Johnson was distinguishable and that Smith had met her burden, was erroneous. Because of this erroneous application of the law, the CHRO hearing officer's finding of liability must be reversed and DOT's administrative appeal therefrom sustained.
Because of the foregoing finding by this Court, DOT's remaining arguments concerning the lack of evidence of pretext and an abuse of discretion by the hearing officer by excluding rebuttal evidence, will not be addressed by this Court.
Based on all of the foregoing, DOT's administrative appeal in this matter is sustained. The CHRO hearing officer's decision as to liability is reversed and this matter is ordered remanded to CHRO with direction to enter judgment for DOT.
Michael Hartmere, Judge